**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

|  |  |  |
|---|---|---|
| PALLADIN TECHNOLOGIES, LLC and PALLADIN CONSULTING, LLC, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. _____ |
| JONATHON MILLMAN, TUAN NGUYEN, RYAN PRESCOTT, and PERFICIENT, INC., | ) ) ) ) | |
| Defendants. | ) ) | |
| _____ | ) | |

**VERIFIED COMPLAINT**

Plaintiffs Palladin Technologies, LLC and Palladin Consulting, LLC (collectively, "Palladin" or "Plaintiffs"), by and through their undersigned attorneys, as and for their Complaint against Defendants Jonathon Millman ("Millman"), Tuan Nguyen ("Nguyen"), Ryan Prescott ("Prescott") (collectively "the employee Defendants"), and Perficient, Inc. ("Perficient"), alleges and sets forth as follows:

**OVERVIEW**

This case is about deceit. Three former employees, Millman, Nguyen and Prescott, were hired to contribute to the success already enjoyed by Palladin as a

1

leading systems implementation and integration firm focused on Salesforce.com's ("Salesforce") enterprise software.  Instead, they deliberately sabotaged the business' performance while damaging customer and partner relationships so severely that when they resigned to join Palladin's competitors, Palladin's business would follow them to their new employers.  The aggregate, irreparable damage to Palladin by defendants caused the failure, in December of 2025, of a pending acquisition of Palladin.

All three former Palladin employees resigned in January and February of 2026.  Millman joined Palladin's competitor, Perficient; Nguyen joined another Palladin competitor, The Whole Group, Inc. ("Whole Group"), and Prescott joined Salesforce, Inc. ("Salesforce"), the source of most business for Palladin and its competitors.  Millman, Prescott, and Nguyen participated in the unauthorized and illegal downloading of dozens of thousands of confidential and trade secret files, both before and after they left Palladin.  The stolen files will help the defendants steal Palladin's customers, prospects and partners, unless enjoined by this Court.  Palladin has been and will be further damaged by the defendants' collective actions.

## THE PARTIES

1.      Plaintiff Palladin Technologies, LLC is a Georgia limited liability company with a principal place of business at 1535 Knob Hill Dr NE, Atlanta, GA,

30329. Palladin Technologies, LLC is a managing member of Palladin Consulting, LLC, which is also a Georgia limited liability company.  Both Palladin Technologies, LLC and Palladin Consulting, LLC, do business as Palladin Technologies.  Plaintiff Palladin Consulting, LLC has the same principal place of business as Plaintiff Palladin Technologies, LLC.  Both Plaintiffs are duly organized, validly existing, and in good standing under the laws of Georgia. Plaintiffs jointly own and operate the business known as "Palladin Technologies," and any contract, customer relationship, intellectual property, or trade secret referenced herein is owned, held, or possessed by one or both Plaintiffs.  Palladin is an Atlanta, Georgia based company that entered full-time operations in 2016.  It was founded by Emory University's Goizueta Business School MBA (Honors) graduate, 2025 Emory University B2B Alumni Entrepreneur of the Year awardee and current Chief Executive Officer ("CEO"), Brandon Ward ("Ward").

2.     On information and belief, Defendant Millman is a citizen of Canada with a residence of Ontario, Canada.  Since February 2026, if not sooner, Millman is an employee of Defendant Perficient.  As a foreign individual, he can be served at the place of his U.S. employer, Perficient, or at his residence in Canada. Millman was employed by Palladin from 2024 to February 2026.

3.     On information and belief, Defendant Nguyen is a resident of California with a residence in Pasadena, California.  Starting in February 2026, if

not sooner, Nguyen is employed by Whole Group. Nguyen was employed by Palladin from 2024 to February 2026.

4.      On information and belief, Defendant Ryan Prescott is a resident of Maine with a residence in Saco, Maine 04072.  Starting in February of 2026, if not sooner, Prescott is employed by Salesforce.  Prescott was employed by Palladin from 2024 to January 2026.

5.      On information and belief, Defendant Perficient is a corporation organized under the laws of Delaware and has a place of business at 555 Maryville University Drive, Suite 600, Saint Louis, Missouri 63141.  In October of 2024, BPEA Private Equity Fund VIII, known as "EQT Asia," acquired Perficient. [1]

6.      In October of 2025, Perficient acquired Kelley Austin, LLC ("Kelley Austin"), a direct competitor of Palladin's within Palladin's market focus (a focused sub-set of the vast Salesforce customer base and ecosystem), stating that Kelley Austin would enhance their ability to operate in the Salesforce ecosystem. Perficient's press release stated its goal as follows:

> Today's acquisition builds on the momentum of Perficient's recent announcement of its 360-degree partnership with Salesforce, in which Perficient and Salesforce made a joint commitment to help clients

---

[1] According to Perficient's website, EQT is a "purpose-driven global leading investment organization with $246 billion in total assets under management within two business segments: private capital and real assets."  EQT Asia is headquartered at 88 Market Street #48-02, CapitaSpring, Singapore 048948.

harness the full potential of AI and agentic solutions, like Agentforce, to drive transformation at scale.[2]

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1337.

8.      This Court has federal question jurisdiction because Palladin asserts claims under the Defend Trade Secrets Act, 18 U.S.C. § 1836 et seq., the Lanham Act, 15 U.S.C. § 1125, and the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq*.

9.      This Court has supplemental jurisdiction over all claims for which this Court lacks original jurisdiction because Palladin's claims arise out of the same common nucleus of operative facts, namely Defendants' improper and illegal conduct to interfere with and unfairly compete with Palladin.

10.      This Court has personal jurisdiction over Millman because he has had, and continues to have, consistent and continuous contacts with this judicial district well beyond the minimum contacts necessary for exercising personal jurisdiction.

11.      Personal jurisdiction over Millman is further justified because at least some of the misconduct alleged herein occurred while Millman was an employee

---

[2]    https://www.perficient.com/news-room/news-releases/2025/perficient-acquires-kelley-austin

of Palladin, which is a Georgia business operating within the Northern District of Georgia, and therefore, Millman's conduct caused harm and injury in Georgia.

12.    This Court has personal jurisdiction over Nguyen because he has had, and continues to have, consistent and continuous contacts with this judicial district well beyond the minimum contacts necessary for exercising personal jurisdiction.

13.    Personal jurisdiction over Nguyen is further justified because at least some of the misconduct alleged herein occurred while Nguyen was an employee of Palladin, which is a Georgia business operating within the Northern District of Georgia, and therefore, Nguyen's conduct caused harm and injury in Georgia.

14.    This Court has personal jurisdiction over Prescott because he has had, and continues to have, consistent and continuous contacts with this judicial district well beyond the minimum contacts necessary for exercising personal jurisdiction.

15.    Personal jurisdiction over Prescott is further justified because at least some of the misconduct alleged herein occurred while Prescott was an employee of Palladin, which is a Georgia business operating within the Northern District of Georgia, and therefore, Prescott's conduct caused harm and injury in Georgia.

16.    This Court has personal jurisdiction over Perficient because it has had, and continues to have, consistent and continuous contacts with this judicial district well beyond the minimum contacts necessary for exercising personal jurisdiction,

through its direct actions and through a Perficient entity having a place of business at 13560 Morris Rd., Suite 3500, Alpharetta, Georgia.

17. This Court has personal jurisdiction over Perficient, additionally because Millman, through Perficient, has interfered with Palladin's employee and business relations, of whom are based in Georgia, and caused harm and injury to Palladin in Georgia.

18. Personal jurisdiction over Perficient is further justified because Perficient does business in Georgia through its subsidiary, Catalyst Networks, Inc., d/b/a Brainjocks, a Georgia company it acquired in 2022.

19. Venue is proper in this District and Division pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this action took place in this District and Division and the harm and injury to Palladin is felt in this District.

20. Jurisdiction and venue are proper due to contractual covenants in the employee Defendants' employment agreements, whereby they agreed to jurisdiction and venue in the United States District Court for the Northern District of Georgia. In addition, the employee Defendants waived by agreement any objection to jurisdiction and venue and any defense claiming lack of jurisdiction or improper venue.

**NATURE OF THE ACTION**

21.    No later than 2025 Defendants Millman and Prescott began a campaign of self-dealings, intentional misrepresentation, trade secret theft, and willful breach, recruiting the assistance of Defendant Nguyen and for the benefit of Millman's new employer, Defendant Perficient.  Millman and Prescott put into action their campaign of self-dealing by (i) accepting large salaries as officers of Palladin, specifically tasked with growing business and managing operating expense and profit, with no intent of returning value or upholding their duties as officers; (ii) diverting their efforts and expertise to competing entities, while misrepresenting their true intent to sabotage and  defraud  Palladin; (iii) recruiting Palladin personnel and customers to other competitive ventures, in breach of their non-solicit obligations; and (iv) stealing tens of thousands of confidential, proprietary, and trade secret documents.

22.    Millman and Prescott sabotaged customer and partner relationships while employed by Palladin to make Palladin unattractive as an acquisition target. At the same time, they promoted themselves as the only ones at Palladin who could service Palladin's customers and partners.  By doing so, Millman and Prescott expected Palladin's customers to leave once Millman and Prescott resigned. This expectation is now manifesting into reality, contemporaneously and voluntarily admitted to by Defendants Millman and Prescott.

23.    To make matters even worse, Millman and Prescott spent over $600,000 in capitalized labor (and approximately $1.5 million of annual payroll expense) of Palladin's funds to build a trade secret connector product for WideOrbit, Inc. ("WideOrbit") which they then misappropriated at or around the time Millman and Prescott resigned from Palladin.  Millman and Nguyen, without permission or right, took the WideOrbit connector through direct systems access, relationship interference, and massive, unauthorized downloads of Palladin confidential and trade secret files.

## FACTUAL BACKGROUND

### A.    Palladin's Relationship With Salesforce

24.    Prior to events leading to the filing of this action, Palladin enjoyed a rapidly growing team, at one time numbering approximately 140 full-time members in 2025 with over 600 Salesforce certifications.[3]  Palladin's business relies heavily on its relationship with Salesforce, as it specializes in Salesforce implementation, advisory, optimization, integration, AI and managed services for its clients. These services include technologies published/ offered by Salesforce.

---

[3] Salesforce certifications validate one's expertise in various aspects of the Salesforce platform, including administration, development, marketing, and consulting. Salesforce certifications are highly regarded in the industry, provide objective evidence of a company's Salesforce expertise, and contribute significantly to the "Partner Tier", such as "Summit" that a Salesforce Consulting Partner or Managed Services Partner earns. Palladin participates as both a Consulting and Managed Services Partner with Salesforce.

25.    In 2024, Inc. Magazine ("Inc.") announced that Palladin ranked No. 656 on the Inc. 5k List, a ranking that provides a data-driven snapshot of the most successful companies within the economy's most dynamic segment—its independent, entrepreneurial businesses. Past honorees include, among others, Microsoft, Meta, Chobani, Under Armour, Timberland, Oracle, and Patagonia. In September 2024, Palladin was featured in EY Technology Investment Banking's annual Salesforce Ecosystem Report as an "Industry Specialist"; Palladin's logo was placed prominently next to that of Coastal Cloud, later sold by Sverica private equity owners for over $700,000,000. In 2025 Palladin ranked No. 325 on the Inc. 5k List, driving a significant increase in Palladin's ranking, visibility and market prominence. In April 2025, Emory University recognized CEO Ward as the B2B Alumni Entrepreneur of the Year at the entire University level. In June of 2025, the Association for Corporate Growth ("ACG") recognized Palladin as the #3 fastest-growing company in Georgia's lower mid-market segment at the ACG GAFast40 award ceremony. Palladin's meteoric growth has been in large part the result of its Salesforce expertise.

26.    Until recently, Palladin was a "Summit" partner with Salesforce and still is a Certified Partner for Agentforce. As well, Palladin is a "FY27" (Feb. 1, 2026 to Jan. 31, 2027) named member of the Salesforce "Partner Advisory Boards" for the Communications industry and Salesforce's Agentforce product. A Summit

Salesforce Partner is a consulting partner at the highest tier of Salesforce's partner program, other than that enjoyed by global giants such as Accenture, Perficient, Deloitte, PwC, IBM and the like. Summit tier status indicates profound expertise, successful customer outcomes and contributions to the Salesforce ecosystem. Agentforce is Salesforce's AI-forward next-generation product and platform. Being named on the "Partner Advisory Board" for product and/or industry by Salesforce is held in high regard, as Salesforce makes these elections. Thus, Palladin is a highly accomplished Salesforce consultancy. Palladin's relationship with Salesforce has been mutually beneficial and symbiotic.

27. In 2025, Palladin "co-sold" the most amount of annualized contract value with Salesforce of any other of over 3,000 "unmanaged" Salesforce partners,[4] as relayed to Micaela Purcell, Palladin's Alliances Manager (sales channel manager) by a Salesforce Partner Sales leader.

28. As a Salesforce Summit Partner, Palladin specialized, and still specializes today, in guiding clients across various industries to achieve rapid scalability and sustainable growth. Target clients include those in telecommunications, media, technology, and consumer business services. Now

---

[4] Unmanaged Salesforce partners are those whose footprint is less significant than that of global systems integrators, such as Accenture, Deloitte, and Perficient.

11

entering its 11th year in full-time operation, Palladin has successfully worked with clients across a gamut of industries and market segments.

### B.    Millman's Role At Palladin

29.    Defendant Millman was hired in March of 2024 as the Executive Vice President of Business Development.  His responsibilities included continuing the growth of the company and expanding Palladin's business into the Media vertical market and Canadian territory. In February 2025, Millman ascended to the role of Chief Sales Officer ("CSO"), with a press release to that effect released in March of 2025.  Millman's CSO responsibilities included managing a sales team that reported directly to him.

30.    Millman's promotion came with responsibilities beyond sales, including strategic leadership and collaboration with Palladin's executive team to develop and implement operational strategies aligned with the organization's goals. He was tasked with gaining stronger access and deriving revenues from the media industry, the Canadian territory, retaining Palladin's telecommunications industry footprint, and expanding company-wide revenues, and selling into the "installed base" of 150,000 existing Salesforce customers, including approximately 90% of the Fortune 500 companies.

31.    Millman was hired at least in part for his significant professional experience, knowledge and network connections in media, the Canadian

geography, and relationships with Salesforce, all of which he committed to Palladin to bring to bear with his best efforts and energy to match.  A sophisticated, experienced owner/operator who successfully sold a similar, albeit substantially smaller firm, Shift CRM, Millman's experience with "owner exits," was considered by Ward and Palladin's Executive Committee to be an asset since Palladin was interested in being acquired.  As such an experienced owner/operator, Millman is well-versed in market economics and valuation methods and multiples for private firms operating in the same market as Palladin.

32.     Millman was employed as a senior leader and officer, based in part on his prior experience running and selling Shift CRM, and on his knowledge and network.  As a special inducement for his hiring, Millman assured Palladin's CEO Ward that Millman would propel Palladin further on its then-incredible growth path, as evidenced by the Inc. 5k List, and other accolades Palladin and Ward had earned.[5]

33.     Millman was given virtually complete and total access to all Palladin operations, employees and contractors, information systems, intellectual property,

---

[5] Mr. Ward and Palladin's industry recognition include Emory University's 2025 B2B Entrepreneur of the Year, Southeast Regional Semi-Finalist as Ernst & Young's 2025 Entrepreneur of the Year, and recognition in 2025 by the Association for Corporate Growth ("ACG") as a "Georgia Fast40 Company", ranking 3rd fastest growing company in Georgia in the lower middle-market segment.

trade secrets, methodologies, and critically sensitive strategic and financial data. His job was to bring these resources to bear holistically, with effective operational planning and execution focused on furthering Palladin's strategic objectives, monitoring performance, and, as an officer, responsibly managing the areas within his domain to steward the business, taking corrective actions as an officer, manager and leader while working with other leaders and managers throughout the organization.

34.    Millman was also responsible for cross-functional collaboration which emphasizes fostering revenue growth through client retention and expansion, existing and new relationships, the media industry, Canadian territory and installed Salesforce customer base.  Millman had complete knowledge of Palladin's client base and was principally responsible for retaining customers and developing new business.

35.    As a high-level officer, Millman was required to facilitate communication between departments and to align strategies with other executives, all of which are functions of an officer of the company and are critical tasks for company success.

36.    Millman worked initially as an individual contributor with significant latitude and no "official" direct reports, and then as an officer leading a sales team of multiple sales representatives.  Millman's position at Palladin required a person

of high-performance and effective management whose skills would result in higher revenues. Millman managed and oversaw vendor, customer, and partner relationships, and participated in negotiating sensitive contracts with each. Millman's generous executive compensation package met or exceeded $300,000 base salary annually, with a 50% performance bonus, paid quarterly.

37.    Because of his many and varied executive level job requirements, and his successful track record at Shift CRM, Millman knew or should have known whether Palladin was on track to meet revenue expectations.

### C.    Prescott's Role at Palladin

38.    Defendant Prescott was hired in February of 2024 as the Executive Vice President of Emerging Markets, reporting directly to Palladin's CEO Ward, at a salary of $235,000 annually with a 50% bonus potential.

39.    Like Millman, Prescott was hired by Palladin as an executive level officer with fiduciary and contractual duties to secure the successful growth and profitability of Palladin.  And like Millman, Prescott was highly compensated and was eligible for bonuses based on increasing company revenues and had like access to Palladin resources, relationships, employees, sensitive and trade secret information, confidential financial information and more.

40.    In October of 2024, Prescott was promoted to Chief Operating Officer ("COO"), a position which gave Prescott even greater access to Palladin's business

relationships, sensitive documents, and plans for ultimately finding an acquisition partner. Prescott's generous executive compensation package met or exceeded $290,000 base salary annually, with a 50% performance bonus, paid quarterly. Prescott was given a salary increase on December 01, 2024 to $290,000 annually, with the same 50% bonus potential, at Prescott's request, and as recognition of Prescott's promotion to COO.

41. Like Millman, Prescott was a member of Palladin's executive committee, which met weekly, with full and complete knowledge of Palladin's financial health, sales pipeline, customer contracts, projects, initiatives, and prospects. Prescott, along with Millman, were two of a select few officers and executives who had detailed knowledge of Palladin's acquisition intent and partners, including potential acquirers and related market intelligence on comparable terms and conditions for firms such as Palladin's, of which private valuations are established, in whole or in part.

**D. Nguyen's Role at Palladin**

42. Defendant Nguyen was hired in May of 2024 as the Senior Technical Architect with an annual base salary of $195,000 and 15% bonus potential. Nguyen's responsibilities included designing, delivering and directing the delivery of technical solutions for clients, creating and/or customizing software and intellectual property that facilitates integration of Palladin's services with

16

Salesforce on behalf of customers like Outfront Media, Inc. ("Outfront") and partners like WideOrbit.

43.    In May of 2025, Nguyen was promoted to Technical Architect/Development Lead, with increased responsibility and a substantially higher compensation package, with a base salary of $214,500 and 25% bonus potential.  Given the prominence, scope, access, impact and responsibilities with this role, Nguyen was, by virtue of his employment as Palladin's senior Technical Architect and Technical Architect/Development Lead with access to Palladin's confidential and trade secret information, an employee and agent who owed Palladin fiduciary duties of loyalty and good faith.  In the alternative, Nguyen was a de facto officer level employee due to his access to Palladin's computer systems and his role in creating Palladin intellectual property and responsibility for delivering technical and complex solutions for customers, of which Nguyen's experience in the Media industry was known to be extensive.  Nguyen was the Lead Technical Architect on key Palladin projects, including Palladin's WideOrbit "Fusion API" connector for "MCCORE" ("Media Cloud on Core").  MCCORE is associated with Palladin's customer Outfront.

## DEFENDANTS' CONTRACTUAL OBLIGATIONS

44.    Millman, Nguyen and Prescott signed employment agreements that contain, among other things, express or implied covenants and duties not to

17

disparage, solicit, or compete during the term of employment and for a period of two years after termination of employment for Prescott and Nguyen and one year for Millman.[6]

45.     The employment agreements also contained detailed non-disclosure covenants regarding confidential and trade secret information.

46.     Each employment agreement required the utmost faith and loyalty, and dedication to Palladin's business interests.   Each employee agreed to dedicate his time exclusively to matters related to their employment with Palladin.

47.     Through constructively similar, if not identical language, each employment agreement vested in Palladin all right, title, and interest in any work product, inventions, discoveries, designs, processes, programs, methods, techniques, concepts, ideas, and other developments created or conceived by the employee during the course of their employment (collectively, the "Work Product"), whether or not patentable or copyrightable. Each agreement granted Palladin the exclusive right to obtain and hold in its own name any copyrights, patents, formulas, design registrations and continuations thereof, proprietary

---

[6] Due to his status as a Canadian citizen, Millman's employment agreement was made with an "employer of record," Deel, Inc. ("Deel"), based in California.  Deel handled payments to Millman, benefits, and Canadian tax withholdings, and other things to comply with Canadian employment law.  In all other aspects, Millman's employment contract with Deel translates his responsibilities and covenants to the real employer, Palladin.

18

database rights, trademarks, rights of publicity, and any other intellectual property protections available in the Work Product.

48.     Defendants Millman, Prescott and Nguyen all agreed, both during and after employment with Palladin, to take all acts reasonably necessary to transfer, perfect, and defend Palladin's ownership of the Work Product, including without limitation: (i) executing all documents, assignments, and instruments required for filing applications or registrations for protection of the Work Product; (ii) reviewing applications and related papers; (iii) explaining the nature of any Work Product to persons designated by Palladin; and (iv) providing any other assistance reasonably required for the orderly prosecution of such applications. Each agreement also required the employee to disclose to Palladin all such Work Product promptly upon its development, whether conceived alone or jointly with others.

49.     In addition to covenants expressed in their employment contracts, each employee agreed to express and/or implied duties to comply with all company policies, including those expressed in the Palladin Employee Manual.

50.     Each employment contract provided high base salaries plus generous bonuses in exchange for adherence to the restrictive covenants.  The employees also agreed to dedicate their work efforts exclusively to Palladin and no others, including and especially not to their self-interest and promotion.

51.   Each employee Defendant agreed that Palladin's trade secrets were valuable and could not be converted for their own use.  Each employee further agreed that the restrictive covenants were reasonable and necessary.

52.   The non-solicitation covenants expressly provide for non-solicitation of Palladin's clients and non-recruitment of Palladin's employees by solicitation, recruitment and/or inducement.

53.    Defendants Millman, Prescott and Nguyen further agreed in their employment agreements that a breach of their employment agreements would result in irreparable harm for which damages would be difficult to assess, and that Palladin would be entitled to obtain preliminary and permanent injunctive relief, together with an accounting of all profits and benefits arising out of such violation. With respect to such injunctive relief, each Defendant further agreed that (i) no bond would be required; (ii) Palladin would not be required to submit proof of the economic value of any Trade Secret or Confidential Information; (iii) no adequate remedy at law existed; and (iv) each Defendant would waive and would not assert any defense related to the breach of these covenants.

54.   Prescott and Nguyen's employment agreements provide that, in any action to enforce the agreement, Palladin is entitled to recover its reasonable attorney's fees and costs incurred in such action.

55.    Each employment agreement included a covenant that required, upon resignation, each employee to notify Palladin of his new employer, job title and responsibilities at his new place of employment.

56.    The purpose of the notice covenant is important and legitimate, as it informs Palladin of potential exfiltration of confidential information when the new employer is a competitor and the new responsibilities overlap with those at Palladin.  Prescott, Millman and Nguyen failed to comply with the notice covenant upon resignation.

## PALLADIN'S ACQUISITION PLANS

57.    In 2024, Palladin started pursuing an acquisition deal valued at thirteen (13) times EBITDA.[7]  In part, the equity value of Palladin depended on revenue growth and management of operational expenses.

58.    Millman and Prescott were aware that Palladin was considering an acquisition. In or around May of 2024, Palladin was approached by QVest Group GmbH ("QVest") who was interested in acquiring Palladin.[8] QVest as an acquisition partner was known to both Prescott and Millman at the time QVest expressed interest and during follow-up negotiations.

---

[7] "EBITDA" stands for Earnings Before Interest, Taxes, Depreciation, and Amortization
[8] https://qvest.dev/#about

59.    Following QVest's contact, Palladin signed an agreement with a transaction advisor, Equiteq, Inc. ("Equiteq").  Equiteq promotes itself as an "elite global investment bank operating as a trusted advisor to companies transforming the world through technology and specialty services."[9]

60.    Palladin engaged Equiteq on a non-exclusive basis to act as a sell-side M&A focused investment bank.  Palladin's agreement with Equiteq included a carve-out for QVest. Millman and Prescott were fully aware of the QVest opportunity, the Equiteq engagement, and the terms being negotiated.

61.    In September of 2024, Palladin received a Letter of Intent ("LOI") from Virtusa Corporation ("Virtusa"), an information technology services company that provides consulting and outsourcing services.  In February of 2021, Virtusa was acquired by Baring Private Equity Asia ("BPE").[10] And in 2022, BPE was acquired by EQT AB ("EQT"), a Swedish global investment entity.[11] BPE was fully absorbed into EQT in January, 2024.[12]  EQT also owns Perficient.

62.    Through a non-disclosure agreement ("NDA"), and as part of the due diligence review preceding the potential acquisition, Virtusa (and presumably EQT

---

[9] https://www.equiteq.com
[10] https://www.virtusa.com/news-room/press-releases/year_2020/september/baring-private-equity-asia-to-acquire-virtusa
[11] https://www.reuters.com/world/eqt-buy-asian-investment-firm-bpea-75-bln-deal-2022-03-16
[12]    https://eqtgroup.com/news/bpea-fully-transitions-into-eqt-s-global-name-and-brand-identity

as the owner) had access to highly confidential Palladin business and technical documents that were made available through a virtual data room ("VDR").   Rather than proceeding with Virtusa, Palladin signed an exclusive LOI with QVest in early October of 2024, at an enterprise valuation ("EV") of approximately $60 million. However, Palladin rejected the deal after the parties could not agree to terms.

63.     Defendants Prescott and Millman were aware of the negotiations, the general terms of the QVest potential acquisition and the parties' failure to agree to terms.

64.     Millman and Prescott, as officers, were incentivized to find and close an acquisition deal.  Beginning in 2024, and through August 2025, Defendants Millman and Prescott were made aware of the generous financial incentives that would be made available to them, upon a successful sale of Palladin, and no later than August 2025, or thereabout, received agreements to review and execute.  The agreements would have entitled them to receive "phantom equity", in the form of substantial cash bonuses anticipated to approach or exceed $1,000,000+ per recipient, in the event of an acquisition of Palladin by a third party or parties. The phantom equity offerings were in addition to their generous salaries and bonus arrangements which would have been increased had Millman and Prescott's efforts led to higher revenues and sufficient EBITDA, thus driving Palladin to a successful

23

acquisition outcome. Millman, particularly, was able to readily surmise the EV of Palladin, and suggested specific figures in a phone call with Ward in January 2025.

65. Millman and Prescott had primary responsibility for maintaining Palladin's revenues on a course that supported an equitable acquisition price. Maintaining revenues at or above past levels required Millman and Prescott to manage customer relationships in a way that existing customers would stay with Palladin, and prospective customers would be brought on board. Maintaining revenues required Millman's and Prescott's complete attention and dedication as did the management of their departments' operating expenses ("OpEx"), to manage cost and increase EBITDA.

66. By the first quarter of 2025, CEO Ward formally and explicitly notified the EXCOM in writing and graphical illustration, which included Millman and Prescott, of the need to step up efforts to bring in new accounts. As Ward pointed out to the EXCOM, significant new customers had not been secured, and a key account, Gridiron Fiber, d/b/a Lumos ("Lumos"), would complete a massive project that contributed substantially to Palladin's then-current revenues. In early 2025, Lumos, with the assistance of Palladin's technology services teams, would successfully close on a joint venture investment. On information and belief, Lumos is owned 50/50 by T-Mobile and EQT. A significant portion of Lumos' successful transaction, and, on information and belief, EQT's investment thesis in Lumos, was

24

based on work that Palladin was contracted to, and did, successfully deliver. To incentivize Millman and Prescott's teams to acquire new customers, CEO Ward provided a sales compensation plan that, per Millman and Prescott, was "the most generous commission plan in the industry; it is too rich," or words to that effect, echoed by Millman and Prescott, both on the same conference call with CEO Ward. Ward emphasized the imperative to acquire new customers, and his significant investment in Millman and Millman's sales team to do so. This conference call occurred in or around the middle of February 2025, and the referenced compensation plan presented by CEO Ward to Millman's sales team at Millman's Sales Kickoff ("SKO") meeting in mid-March 2025.

67.    Ward pointed this out repeatedly to the Executive Committee verbally, and in graphic format in the first and early second quarter of 2025. Prescott asserted that, with his leadership, Millman's team's results would radically change and address the comparative dearth of sales volume generated by Millman and Millman's sales team. With those assurances, in June of 2025, Prescott requested, and the Executive Committee granted, that Millman report to him rather than Ward. As of or near the date of Millman's reporting change to Prescott, Prescott began a lengthy, extensive effort to discredit, disparage, and block CEO Ward from Palladin's employees, partners and customers.

68.     In May of 2025, with general knowledge of Prescott and Millman, Palladin engaged Tequity Ltd., d/b/a Tequity Advisors ("Tequity"), to assist in pursuing other acquisition partners.  Tequity is a sell-side M&A advisory firm with core expertise in B2B enterprise cloud, SaaS and IT companies.[13]  Tequity was well-known and active in the Salesforce ecosystem marketplace, working with many sophisticated buyers, including PwC Canada, Accenture, EY and other large consolidators.  Tequity separately served as exclusive sell-side advisor for Salesforce-ecosystem and IT-services consulting companies acquired by PwC Canada (Avaleris[14], Cinovate[15]) and other Big Four professional services acquirers, including Accenture and EY[16], demonstrating a pattern of delivering technology consulting sellers to professional services consolidators.

69.     On information and belief, Tequity, a Canadian company, had a prior relationship with Millman and was his advisor when he sold his company, Shift CRM ("Shift").  Millman emphatically recommended Tequity to be Palladin's advisor to CEO Ward and others in executive management.

---

[13] https://www.tequityadvisors.com

[14] Tequity Advised Avaleris on Acquisition by PwC Canada, 2021

[15] According to Tequity's website, Cinovate was acquired by PwC of Canada. https://www.tequityadvisors.com/transactions/cinovate-was-acquired-by-pwc-canada

[16] https://www.tequityadvisors.com

26

70.     On information and belief, after engaging with Palladin, Tequity committed to "1 to 2 LOIs" in June 2025, with one likely coming from a subsidiary of Bell Canada.  Similar commitments on expected LOIs were made by Tequity for the months of August, and then, September 2025. Despite positive assurances, Tequity produced one introductory meeting with a prospective buyer, Tailwind Capital ("Tailwind") in June 2025 and zero LOI's in June, July and August of 2025, even though Tequity represented that its VDR had over 150 potential prospects viewed Palladin's information.

71.     The preamble of Tequity's engagement letter with Palladin grants Tequity exclusive referral rights over all prospective purchasers.  Section 2(g) of the engagement letter further authorizes Tequity to direct that purchaser payments be made to Tequity rather than to Palladin.  In Section 6(c) of the engagement letter, Tequity goes on to expressly disclaim fiduciary or agency duty to Palladin and requires a waiver by Palladin of any claim based on such duty.

72.      Tequity, by virtue of its Confidential relationship and exclusivity, under Georgia § 23-2-58, had a "controlling influence" over Palladin, requiring the utmost good faith, regardless of the terms of its engagement letter.

73.     The Confidential Information Memorandum ("CIM") committed to by Tequity in its engagement letter to Palladin, while promised *promptly* was not delivered until August.  Even then, the scant materials produced in writing for the

27

market by Tequity required substantial revisions by Ward, including, but not limited to, basic information such as the names & photographs of leadership, Palladin's market focus and other elementary information required by prospective investors. Likewise, weekly status updates were not delivered other than brief conference calls, despite repeated requests by CEO Ward for written, regular updates.  The delays in Tequity's committed "action plan to go to market and locate potential Purchasers as soon as possible after the execution of [the] Agreement [between Palladin and Tequity]" per the Engagement Letter effectuated delays in Palladin's presentation to prospective investors, and the "owner exit" sought by Palladin for CEO Ward.

74.    In August of 2025, Tequity committed to deliver up to three LOIs in September of 2025 but delivered none.  In October of 2025, Tequity delivered to Palladin a LOI from Movate, Inc. ("Movate").  Movate is a digital technology and customer experience services company.[17]  In November of 2025, Palladin executed the Movate LOI, setting a closing date of December 22, 2025.

75.    Like prior opportunities, the Movate acquisition depended on Palladin's revenues and EBITDA, both present and future revenues based on projections from partnership relationships, as well as prospective and current customers.

---

[17] https://www.movate.com/about-us/who-we-are

76.    Defendants Prescott and Millman negotiated a strategic channel partnership ("partnership") with WideOrbit, a market leader in media revenue workflow management in or around the third calendar quarter of 2025.[18] The WideOrbit partnership was projected to bring approximately $39 million in revenue to Palladin due at least in part to proprietary technology that would differentiate Palladin from its competitors, including Defendant Perficient/ Kelley Austin.

77.    Palladin and WideOrbit entered the initial stages of their partnership in the fall of 2025 by executing a Technical Integration Agreement.  This partnership was announced with great fanfare at Salesforce's "Dreamforce25" conference in San Francisco, CA in October 2025.  From the time of the Technical Integration Agreement's initiation to very recently, the relationship between WideOrbit and Palladin was healthy and developing on schedule, and ahead of WideOrbit's own technical team, according to Defendants Millman and Prescott.

78.    In November of 2025, Movate and Palladin executed the LOI and agreed to a December 22, 2025 closing date.  The success of the Movate deal depended at least in part on Palladin's partnership with WideOrbit.

---

[18] https://www.wideorbit.com/about

79.    On information and belief, a small group of insiders at Palladin knew the terms *and criticality* of the WideOrbit partnership and the Movate LOI, including Prescott, Nguyen and Millman.

80.    A month after the LOI was signed, the acquisition deal collapsed and was terminated by Movate on December 16, 2025, based on information provided by Tequity, as relayed to Tequity by PwC.

81.    Within days of the failed acquisition, Prescott resigned.  He later became an executive-level employee of Salesforce, Inc. ("Salesforce").[19]  Within a matter of weeks of Prescott's resignation, Millman resigned and became an employee of Palladin's competitor, Perficient.[20]  And within days of Millman's resignation, Nguyen resigned and became an employee of Palladin's competitor, The Whole Group, Ltd. ("Whole Group").  Prescott's new position at Salesforce is one where he can pick and choose among the thousands of Salesforce partners who will receive recommendations from Salesforce for new business.

---

[19] Salesforce collaborates with its Summit Consulting Partners, including Palladin, through a structured approach that includes exclusive resources, training and co-marketing opportunities.  Summit Partners are certified experts who develop, implement, and optimize Salesforce solutions for clients.  Palladin and their competitors enjoy a symbiotic relationship with Salesforce.  *See* https://help.salesforce.com/s/articleView?id=000394716&type=1.

[20] In October of 2024, Perficient announced that it had been acquired by BPEA Private Equity Fund VIII, known as "EQT Asia," for $3 billion.

## LOSS OF CUSTOMERS AND THEFT OF TRADE SECRETS

82.     When the Movate deal collapsed, Palladin still had significant revenue generating relationships with partner WideOrbit and customer Outfront.  After Millman, Prescott and Nguyen departed, WideOrbit and Outfront announced their intention to leave Palladin. Palladin has also lost, or is being threatened with the loss, other customer relationships to which Millman and Prescott are privy, including but not limited to Televisa Univision ("TU"), Tegna / Premion (interchangeably, "Tegna", "Tegna / Premion" or "Premion" ), the Washington Post, Breadner Trailers, and others.

83.     After the departure of Millman, Nguyen and Prescott, Palladin investigated the reasons why they left, and discovered a conspiracy by Prescott, Millman and Nguyen to sabotage Palladin's relationships with Outfront, WideOrbit, and others, and steal trade secrets.  On information and belief, Millman, Nguyen and Prescott intentionally harmed Palladin by (1) orchestrating the failure of the Movate acquisition by (2) overseeing the decline of Palladin's revenue and concurrent mismanagement of its OpEx structures, (3) stealing trade secrets so that Palladin's former clients and partners would have a smooth transition away from Palladin to their new employers, (4) intentionally sabotaging project outcomes with large accounts and partnerships.  On information and belief,

31

Perficient was aware and received the benefits of the scheming by the other defendants.

84.   Millman, Prescott and Nguyen conspired to devalue Palladin to the point of preventing its acquisition by Movate and others. They achieved devaluation by deliberately and maliciously sabotaging Palladin's WideOrbit partnership and by creating a false narrative that significant customer relationships depended exclusively on Millman and Prescott. Their specific intent was to have customers and partners leave Palladin and follow them to their new jobs, for financial gain to them and loss to Palladin.

85.   Millman convinced WideOrbit, over a span of months, that he was the "sole point of contact" at, and the "gateway" to, Palladin for the Palladin/WideOrbit partnership.  Millman held weekly meetings with WideOrbit, known to Prescott, but not reported to the EXCOM in any weekly meeting.  As a result, when Millman resigned, WideOrbit did in fact immediately cancel the partnership.

86.   On February 18, 2026, in a video conference, Karl Moore of WideOrbit abruptly cancelled the partnership with Palladin.  Mr. Moore stated to CEO Ward and two other Palladin employees that Millman was the "sole gateway" into Palladin for the WideOrbit partnership.   Moore's cancellation came less than

five (5) minutes into the video conference and ten days after Millman joined Perficient.

87.     By creating the impression that he was the "sole gateway," Millman violated his contractual covenants to use best efforts to expand Palladin's business. Millman used his position at Palladin to convince WideOrbit that he was solely responsible for the work being done by Palladin, which was a false representation. Millman's false representation caused WideOrbit to cancel its partnership with Palladin immediately after Millman departed for Perficient.

88.     Palladin had every capability of performing under the WideOrbit partnership.  Millman's claim to be the sole participant in the relationship is demonstrably false and harmful to Palladin. Millman's harm to Palladin was intentional and was done in violation of his fiduciary duties and contractual covenants, express and implied.

89.     By creating the impression that he was the "sole gateway," Millman violated his fiduciary and contractual duties owed to Palladin to further the commercial interests of Palladin over his own selfish interests.

90.     On information and belief, Millman and Prescott knew that the expenditures of capitalized labor for WideOrbit projects would have no return on investment since, by making Millman the "sole gateway," Millman and Prescott

knew that WideOrbit would cancel their partnership with Palladin when Millman departed.

91. Millman, Nguyen and Prescott conspired to disrupt and cause Palladin's customer Outfront to leave, with the hope of having Outfront join them at their new employers.

92. The week before and the day of Nguyen's resignation, Nguyen completely bungled an Outfront project regarding data loads into production - the environment where users would interact with a live system. The issues with the data loads were so elementary, and foundational to software developers and Salesforce consultants, as to be careless, if not negligent. According to Jeff Wilsey, Senior Vice President of Sales at Outfront, the bungled operation was a "showstopper" defect for which Palladin absorbed warranty expense and suffered significant reputational damage with Outfront and Salesforce. Outfront shortly thereafter ended its engagement with Palladin after Nguyen's resignation from Palladin. Defendant Prescott verbally mentioned to CEO Ward in January 2026, prior to such a debacle, that Outfront was "going with another [consulting] partner," but declined to name the firm when asked.

93. On information and belief, Nguyen's bungling was, therefore, deliberate, in view of his prior completion of multiple cycles of successful data loads for Outfront in December of 2025 and January of 2026 as Palladin's

development for a $3 billion public company and an account highly visible and prominent to Salesforce, as well as Nguyen's aforementioned deep expertise with Media clientele and their Salesforce implementations and related technical details.

94. To service Palladin's customers and partners at their new places of employment, Prescott, Nguyen and Millman undertook a massive exfiltration of proprietary and trade secret files during and after their employment at Palladin.

95. One trade secret was the WideOrbit connector (inclusive of, but not limited to the connector's design, source code, market information, value to Palladin, WideOrbit and Salesforce's Media Cloud CRM[21] products), which Prescott, Nguyen and Millman understood would be of great value in capturing the WideOrbit relationship. This connector was to enable a Salesforce connection with WideOrbit's "next generation" application programming interface ("API"), "Fusion," to which few, if any, other Salesforce consulting firms would have access to/from WideOrbit.

96. Nguyen, in his role as primary technical architect developing the WideOrbit connecter, and using Palladin funds, developed a technically sophisticated "Connected App" as an extraction pipeline targeting Palladin's WideOrbit Media Cloud systems, which bypassed the standard system log-in and

---

[21] "CRM" stands for Customer Relationship Management. According to Salesforce, CRM is a system for managing all of your company's interactions with current and potential customers. *See* https://www.salesforce.com/crm/what-is-crm.

multi-factor authentication ("MFA") protocols designed to secure computer systems. This extraction pipeline gave the conspirators unlimited, unauthorized and lightly secured access to everything necessary to build a partnership with WideOrbit using proprietary technology funded by, and belonging to, Palladin.

97.    Nguyen, a senior Technical Architect, and keeper of Palladin's "crown jewels" of software, downloaded 37,294 files from Palladin's Google Drive enterprise electronic file system on the day of, or after, his emailed resignation to Palladin's CEO Ward, dated February 9, 2026.  Of these, 37,276 files were downloaded in a span of approximately one hour (~63 minutes) on February 9, 2026, at a rate of ~9.9 files *per second during this window alone.*

98.    From December 1, 2025 through February 8, 2026, Nguyen downloaded 604 files, a rate of 0.0069 files per second (approximately equivalent 10.07 files per 24-hour day). Forensic information thus reveals a massive, deliberate and targeted folder and file exfiltration, files that have been or will be shared with Millman and Prescott as part of the conspiracy. Of these files, 3 were Google Takeout "zip" archives, which are compressed folders containing many folders or that consume large storage space. Thus, Nguyen's exfiltration of 37,898 (37,294 on February 9, 2026 + 604 between December 1, 2025, and February 8, 2026) is a lower-bound figure of his exfiltration of Palladin's Google Drive system alone.

99.     During the February 8 – 9, 2026 exfiltration and subsequent days prior to his termination, Nguyen also took without authorization complete technical documentations for major client engagements, methodologies, frameworks, presentations, contracts, project scopes, pricing, resource and rate information, proprietary and reference configurations, capital asset documents, and more, resigning just hours after the mass download episode.

100. On February 10, 2026, Millman's access to Palladin computer systems was deactivated, less than 24 hours after Palladin' CEO Ward discovered Millman's pending employment with direct competitor, Kelley Austin/Perficient.

101.    Evidence of a conspiracy and theft of trade secrets includes, but is not limited to, credential sharing wherein Millman logged into Palladin's WideOrbit/ Media Cloud "MCCore" development environment using Nguyen's username from Millman's home IP address (99.228.36.76) in Thornhill, Ontario, Canada on November 7, 2025 and January 7, 2026.

102.    Nguyen developed, or directed the development of, a purpose-built extraction infrastructure, evidenced by the 818 OAuth logins in February 2026 to Palladin's WideOrbit / Media Cloud "STORM" environment that are attributable to Nguyen's system administrator user account. The last successful login from this account occurred on February 23, 2026, with 1,187 "retry" attempts post-February 23, 2026, continuing through April 28, 2026, the last date available for purposes of

this complaint's drafting.  The last successful login from Millman's, home IP address, 99.228.36.76, occurred on February 25, 2026.

103.   By way of comparison, from September 2025 through January 31, 2026, the average monthly login count for this user and method was 192 logins. The cluster of these and other activities, on information and belief, including mass file/trade secrets exfiltration, resignation timing of the named Defendants from Palladin, customer relationship and partner sabotage, were all directed to a conspiracy between defendants to steal Palladin's trade secrets.

104.   Immediately after Prescott joined Salesforce, Palladin was downgraded from Salesforce's "Summit-Level" to "Select", despite years of successful and significant revenue generation for both Salesforce and Palladin, and without explanation, while being notified that Palladin had achieved Summit-status in September 2025. On information and belief, Palladin's downgrade was connected to Prescott's movement to Salesforce, justifying Prescott's ability to funnel business away from Palladin and into the hands of co-conspirators Millman and Nguyen.

105.   Millman managed the Palladin sales team for eleven months in 2025 and was responsible for identifying sales trends in terms of revenue, acquisition of new customers, "follow-on work," and other contractual agreements that were

expected, in aggregate, to be more than the revenue "backlog" which Palladin had under existing contracts.

106.  Millman and Prescott's positions as officers required them to drive the top-line growth of Palladin.  Palladin's executive committee met weekly, and Millman was privy to confidential information including, but not limited to, competitive strategy, trade secrets, Palladin's commercial and financial structures, and every aspect of Palladin's confidential and trade secret ways of doing business. Millman was also expected to report any problems and any successes for which the sales team was responsible.  During the weekly EXCOM meetings, Millman and Prescott repeatedly offered upbeat assurances that partnerships and sales relationships would result in a rapid uplift in closed sales, and, thus, revenue.

107.  On December 22, 2025, Prescott verbally resigned, and on January 7, 2026, he was terminated as an employee.  At the time of termination, Prescott agreed to stay on as a consultant through the end of January 2026 to manage the handover of accounts, collection of delinquent receivables owed by accounts he sold, transition "warm relationships and introductions" to Ward and others and ensure a smooth transition as he left Palladin.

108. In January 2026, Prescott remarked to Ward that "Salesforce is dead as a channel" for Palladin, and that Palladin, despite its co-sell achievements and Summit status, "wouldn't be recommended in 2026 as a partner."  Prescott blamed

this on Palladin's contractual termination of a client, for whom Prescott was operationally responsible, for delinquent invoices that went into arrears, totaling approximately $1M+ over several consecutive months in the last several months of 2025.

109.   Unbeknownst to Ward, Prescott knew as far back as the second quarter of 2025 that this delinquent client was viewed as a "red account" and perceived as a significant problem with Salesforce. Prescott actively concealed this from Ward, admitting as much in writing, and never made Ward aware of this classification, actively keeping Ward from interacting with Salesforce or resolving matters with the customer. At about the same time in January 2026, Salesforce personnel began sending text messages to Palladin personnel questioning the viability of Palladin's relationship with Salesforce.

110.   According to his linkedin.com profile, Prescott became "Named Account Director" at Salesforce beginning in February of 2026.  This is a Sales / Business Development position with much influence in a given vertical market or segment, as Account Directors recommend the "preferred" consulting partner of Salesforce to Salesforce's customers.

111.   Prescott did not notify Palladin of his new employer, job title and responsibilities as required by his employment agreement.

112.    On information and belief, Salesforce did not seek to verify Prescott's employment, title, responsibilities, income or dates of employment with Palladin.

113.    Nguyen emailed his resignation from Palladin on February 9, 2026.

114.    On February 19, 2026, Palladin terminated Nguyen after discovering he had made the aforementioned massive downloads of Palladin confidential and trade secret documents.  After his resignation, Nguyen continued to access the systems he technically designed with Palladin funds, for Palladin, but which were not made known to anyone else in Palladin to manage onboarding or offboarding of employees.  Nguyen was part of a "shadow organization" inside Palladin, with multiple other parties, known and unknown at the time of this complaint.

115.    According to his linkedin.com profile, as of February 2026, Nguyen is employed by Whole Group as a "Solutions Architect."

116.    Nguyen did not notify Palladin of his new employer, job title and responsibilities as required by his employment agreement.

117.    On information and belief, Whole Group did not seek to verify Nguyen's employment, title, responsibilities, income or dates of employment with Palladin.

118.    On January 27, 2026, Millman resigned from Palladin.  Under Canadian law, Millman was entitled to stay employed until February 20, 2026.

119.   On February 10, 2026, Palladin deactivated Millman's email and systems access after learning that Millman was joining Perficient.  According to Millman's linkedin.com profile, he is "Head of Media" for Perficient, as of February 2026.

120.   On information and belief, Perficient did not seek to verify Millman's employment, title, responsibilities, income or dates of employment with Palladin.

121.   When Palladin was exploring acquisition opportunities, the acquisition price in 2025 was dependent on the relationship Palladin had with WideOrbit, as this partnership represented a "huge market" in the words of Prescott.  WideOrbit was touted internally by Millman and Prescott as a strategic, competitive advantage to potential acquisition suitors in multiple "pitch" calls by Prescott, with CEO Ward in attendance.

122.   Acquisition price is and always has been sensitive to revenue trajectory and profitability, both of which were known to and influenced by Millman and Prescott, both of whom had Palladin's full commitment of capital, resources, responsibility and authority to manage and influence, along with prior experience in so doing at other firms.

123.   On information and belief, over an extended period, and with conspiring coordination, Millman and Prescott suppressed Palladin's acquisition price with the specific intent to make an acquisition of Palladin untenable to

anyone interested in Palladin, and to position themselves as recipients of Palladin's customers and partners.

124. On information and belief, by misappropriating Palladin's trade secrets, and orchestrating the loss of high revenue customers, Millman, Prescott and Nguyen have damaged Palladin and benefited themselves by taking Palladin customers, prospects, partners, and all the tools necessary to duplicate Palladin's successful business.

125. Although Perficient acquired Kelley Austin, they effectively acquired Palladin for free by hiring Millman after his plan to harm Palladin played out with the help of Prescott and Nguyen.

126. The phantom equity documents, which would substantially enrich Prescott and Millman in the event of a successful acquisition of Palladin, were intended to further incentivize Millman and Prescott to increase revenues at a time when Palladin was looking for and considering acquisition proposals. While the select few that had similar agreements executed their phantom equity agreements promptly, Prescott and Millman never executed the equity agreements. This proves they had other deals already made – to leave Palladin and take clients and partners with them.

127. Shortly prior to, or during the due diligence phase of the Movate acquisition, spanning November 2025 through December 15, 2025, Defendant

Perficient purchased Palladin's direct competitor, Kelley Austin.  At about the same time, Millman told former and current Palladin employees that "Kelley Austin is a much better place to work" than Palladin, because Millman had, in his own words, been "regularly texting with [former Palladin employee] Lacy Thomas," then a sales representative at Kelley Austin/Perficient.[22]  Thomas resigned from Palladin in August 2025, and began employment at Kelley Austin in September 2025.

128.   When the Movate LOI was presented, Palladin was in the process of developing its relationship with WideOrbit, which was expected to bring tens of millions of dollars in revenue over the next several years.[23]

129.   At a Salesforce conference called **"Dreamforce25"**, which occurred in October of 2025, Palladin announced the formation of its strategic partnership with WideOrbit and Aria Systems to expand Salesforce Media Cloud's capabilities in the media technology space.  An announcement of Palladin's AI-powered "OrgPAL" software was also announced and publicly promoted at Dreamforce. Representatives of Movate were at this conference and met with Defendant Prescott and a contracted Palladin Board Advisor.  Alex MacKay, Tequity Executive Chairman & Co-Founder, took Palladin's Board Advisor to dinner during the conference.

---

[22] Jonathon Millman verbal conversations
[23] WideOrbit is a wholly owned subsidiary of Canadian-listed Lumine Group Inc.

130.   WideOrbit and Palladin entered into a Technical Integration Agreement, signed by Prescott and negotiated by Prescott and Millman.  However, Millman did not store the Agreement in Palladin systems.  Millman deliberately hid the status and terms of the Agreement from his fellow board members, including CEO Ward, in breach of his contractual and fiduciary duties.  On information and belief, Millman's failure to record the signed WideOrbit agreement in Palladin's electronic storage systems was a part of his scheme to appear to be the "sole point of contact" for WideOrbit.  The failure to record the document in Palladin storage limited access to the contract to just him.

131.   On information and belief, Millman participated, in person and virtually, in a weekly "WideOrbit Salesforce Palladin Sync: Weekly Cadence", organized by Gerard "Jerry" Popescu, Salesforce Senior Director of Product Management, and attended by (i) Defendant Millman, (ii) Chinmayi Bettadapur, Salesforce Vice President & General Manager – Media & Entertainment, (iii) Devlin Jefferson, WideOrbit Chief Revenue Officer, (iv) Derek Metz, WideOrbit SVP of Product Management, (v) Karl Moore of WideOrbit, (vi) Linday Reed, WideOrbit VP of Product Management, as well as others, known and unknown. Despite weekly EXCOM meetings, the frequency, nature and extent of these meetings, and involvement of Palladin personnel, was not communicated by Defendants Millman or Prescott.

132. Most of the attendees of the meeting series were not recorded by Millman in Palladin's CRM, despite Palladin investing in LinkedIn's "Sales Navigator" software that makes such data entry as easy as two (2) clicks, for which Millman was licensed while at Palladin.

133. The "WideOrbit Salesforce Palladin Sync: Weekly Cadence" meeting series, one of several in connection with Palladin's investment in the WideOrbit relationship, recurred weekly, six (6) times, until Millman declined the future meetings on January 21, 2026.

134. In developing the WideOrbit relationship, Millman and Prescott channeled company resources and outside consultants to build data structures and connections specific to WideOrbit, including over $600,000 in capitalized labor for technical deliverables for WideOrbit, including a "next generation" "Fusion" API connector.

135. Palladin's relationship with WideOrbit was to be a significant contributor to Palladin's future revenues and would have supported a higher acquisition price to be paid by Movate or any other acquisition prospect.

136. Millman and Prescott did not increase Palladin's revenues in the second half of 2025. Instead, the revenue fall-off predicted by Ward at the beginning of the year occurred with the departure of key account Lumos (an operating name for Gridiron Fiber, Corp., which is an EQT subsidiary).

137.   Rather than cutting operational expenses as directed by Ward, Prescott and Millman actively diverted Palladin capital into building items for WideOrbit, and "innovation projects" (one other is known as "OrgPAL", an AI-assistant to help customers evaluate their own setups of specific Salesforce products) without submitting a business case (required internal control) for these initiatives and its expected financial investment and return profile.

138.   While Prescott was spending excessive amounts of Palladin capital, he circumvented internal controls by knowingly hiring contractors without the knowledge or approval of Ward or then-CFO Lorna Magill, another act of deliberate concealment and evidence of the "shadow organization" within Palladin.

139.   Promoting himself as the sole point of contact and competence was contrary to Millman's fiduciary and contractual duties to promote the business of Palladin.

140.   Millman and Prescott conspired with others to harm Palladin's ability to achieve a fair acquisition price so that Prescott, Millman and other employees of Palladin could leave and take Palladin's customers to competitors of Palladin.  The conspiracy was generated in violation of Millman and Prescott's fiduciary and contractual obligations and has already caused harm to Palladin.

141.   On December 10, 2025, Salesforce held a breakfast meeting in New York, New York ("Salesforce Agentforce Media SI Partner Advisory Breakfast"),

which was attended by Millman and Prescott. The meeting was also attended by several entities who would benefit from Palladin's loss of customers, including (i) a representative of Virtusa, the EQT company that Palladin did not move forward with under a LOI in 2024,[24] (ii) a representative of Argano LLC (an entity that considered acquisition of Palladin through the VDR), (iii) two (2) representatives of Slalom, Inc., (iv) a representative of competitor Prodapt Solutions Private Limited ("Prodapt"), (v) representatives of global firms including PwC, (vi) a representative of Prescott's former employer, V2 Strategic Advisors ("V2"), (vii) two (2) representatives of Cognizant, (viii) two (2) representatives of Globant, a firm to whom Palladin was introduced by Tequity in or around September 2025, (ix) a representative of Silverline CRM, purchaser of Millman's firm, Shift CRM, and others.

142.   The Defendants held senior roles at Palladin that gave them privileged access to its customer relationships, intellectual property, and strategic plans, and they exploited that access through the deceptive conduct described above. The facts pleaded above establish that each Defendant – with The Whole Group and Perficient as corporate beneficiaries of their misconduct - had both the opportunity and the incentive to extract value from Palladin for personal and competitive gain.

---

[24] (EQT Asia was by then owner of Defendant Perficient and Kelley Austin, and EQT had previously reviewed Palladin's information in VDRs)

143.    PwC was the auditing firm hired by Movate to manage Movate's due diligence for the acquisition of Palladin.  At the time of the meeting, WideOrbit's developing partnership with Palladin would have been known to PwC as Movate's auditor during due diligence, as well as their consulting representative(s) and others at the meeting.  Thus, PwC had a dual presence and exposure to the WideOrbit partnership and its significance, as indicated by public events, such as Dreamforce25, private meetings and presentations, and industry events, such as the "SI Media Partner Advisory" breakfast, in which venues PwC had open access to Defendants Prescott and Millman, as well as Palladin's competitors.

144.    On December 12, 2025, PwC's audit team, on behalf of Movate, demanded with immediate effect a "pipeline and growth plan" of CEO Ward and Palladin, due by Monday, December 15, 2025.  On Sunday, December 14, 2025, Ward, Prescott, and Palladin's CPA met to establish a growth plan and successfully delivered this to Movate.  This plan included information known to Movate and PwC heretofore, and more depth, as requested by PwC.

145.    On December 16, 2025, Movate backed out of the LOI with Palladin.

146.    On December 17, 2025, Prescott sent a Slack instant message to Palladin employee Jenn Pandiscio stating that he (Prescott) was "too big a threat to [Palladin CEO Ward] now."  Palladin employee Pandiscio would resign on January 5, 2026, and announce on LinkedIn the next day that Pandiscio was then employed

49

by Whole Group, Nguyen's soon-to-be employer.  On December 19, 2025, Prescott texted a contracted advisory member of Palladin's Executive Committee that, "[Ward] just needs to close the doors at this point…I've had multiple people ask me this week if there will be a Palladin in 2026."  These statements, against the backdrop of the rest of this complaint are evident of scienter on Prescott's part.

147.  Prescott's written comments are admissions that Prescott and Millman orchestrated the collapse of the Movate acquisition to the benefit of Perficient and Salesforce, and, simultaneously, at the expense of their employer, Palladin.  Further, written comments by Prescott to Palladin's internal employees indicate a sustained, months-long campaign to misdirect, mislead, and malign Palladin and its leadership, including CEO Ward.

148.  On the same day as Prescott's Slack message, Millman took a two-week leave of absence from Palladin, for paid time off.  The time off occurred at a critical time, given Salesforce's normally heavy activity in the fourth quarter, and is notable in its aberrance to traditional "all hands on deck" resource marshalling of leaders at Salesforce consultancies.

149.  At the time Movate backed out of the LOI, WideOrbit was in a solid relationship with Palladin and the future source of significant revenue streams.  Palladin had invested heavily in building its relationship with WideOrbit.

150. On information and belief, Prescott, Nguyen and Millman conspired to cause WideOrbit to terminate its relationship with Palladin.

151. On information and belief, at a time when revenues should have been rising, Millman and Prescott were taking action to decrease revenues at Palladin.

152. On information and belief, Millman kept a copy of the WideOrbit agreement in his personal document handling accounts, in breach of his contractual and fiduciary duties.

153. Millman actively hid from Palladin management and others at Palladin the dynamics of the WideOrbit relationship, and in the process, he kept others from Palladin from communicating with WideOrbit.

154. On information and belief, Millman conspired with Prescott to own the WideOrbit relationship and to take WideOrbit with him to his new employer. The purpose of such a conspiracy was to have WideOrbit leave Palladin when Millman resigned from Palladin. This did in fact happen.

155. In the fourth quarter of 2025, Millman devoted significant time working with WideOrbit, and Prescott approved hundreds of thousands of dollars in capital investment for software and systems to be used in the WideOrbit partnership. This information was actively concealed from CEO Ward and CFO Magill, despite repeated directives from Ward for justification of the business case

investment and information needed for the anticipated transaction, and related due diligence, with Movate and PwC.

156.    Millman and Prescott's waste of capitalized and non-capitalized labor represents a violation of their fiduciary duties to Palladin and their contractual covenants to use best efforts to support Palladin's commercial interests. Defendant ex-employees had sufficient insight into operational and financial data, forward visibility provided by Ward, to apply their experience, for which they were handsomely compensated, to ensure Palladin retain its growth trajectory.

157.    Prescott and Millman demanded independence from oversight, while promising increased sales and revenue.  For both 2024 and 2025, Prescott and Millman did not in fact increase sales and revenue.  The absence of significant new Palladin customers is consistent with the fact that Millman and Prescott conspired to profit from a failed acquisition of Palladin.

158.    Palladin discovered, after Millman and Prescott's resignations, that they, via coordination with Defendant Nguyen, had fraudulently and without authority or valid corporate interest obtained thousands of confidential and trade secret documents related to WideOrbit and other Palladin customers.

159.    As one very specific example, Prescott accessed Palladin's enterprise communication systems, and, in writing, requested a copy of the "OF TDD" (shorthand for Outfront Media Technical Design Document). This document

represented one of, if not the, first implementation of "Media Cloud on Core" in Salesforce history, a platform on which the basis of the WideOrbit Fusion API connectors Palladin was developing, was based. Nguyen responded affirmatively, with words to the effect that he provided Prescott a "comment-free" version of the Outfront Media Technical Design Document.

160. On information and belief, Prescott, at this time, was no longer a contractor to, nor employee of Palladin, and that Prescott, and Prescott alone, had negotiated the Master Services Agreement with Outfront Media, a $3 billion public company, with Palladin to provide its services as "work for hire" to Outfront Media. This same document was one of 450 Outfront documents downloaded by Defendant Nguyen during Nguyen's mass exfiltration of Palladin files, which occurred days before Prescott's request for the "OF TDD".

161. During and after their employment at Palladin, the employee Defendants downloaded tens of thousands of confidential and trade secret business and technical documents related to WideOrbit and other customers, partners, and prospects, secretively, frequently during off-hours, and conveying materials across state and national boundaries.

162. Due to their coordinated efforts and theft, the employee Defendants, if not enjoined, can now pursue WideOrbit opportunities and customers using Palladin trade secret information and property.

53

163. Following the February 18, 2026, video conference, Palladin investigated Mr. Moore's "sole gateway" comment by seeking copies of contracts and tracking communications between Palladin and WideOrbit.

164. In conducting its investigation, Palladin failed to locate the contract between WideOrbit and Palladin, in what should be its appropriate location(s); Palladin's customer relationship management ("CRM") system or its appropriate Google Drive company network folder and file management system.

165. On information and belief, the WideOrbit contract was shared to Millman's personal email and not with any Palladin document handling platforms.

166. Loss of the WideOrbit relation represents a significant loss of revenue, market opportunity, financial and reputational capital for Palladin. But for Millman and Prescott's actions and inactions, Palladin's relationship with WideOrbit would not have been lost. The sole reason for leaving Palladin given by WideOrbit was the resignation of Millman.

167. Palladin had invested at least $600,000.00 in capitalized labor, now impaired (thus impairing owners' equity), in building a pipeline with WideOrbit, estimated to have a high-end projected value of $39 million.

168. On information and belief, Palladin's WideOrbit relationship was deliberately sabotaged by Millman in favor of moving himself and the WideOrbit

relationship to Kelley Austin/Perficient. Millman's deliberate sabotage involves taking actions that are in breach of his contractual and fiduciary duties.

169. Millman's behavior in dealing with the WideOrbit partnership prompted Palladin to undertake a forensic examination of Millman's access to company files. That examination revealed at least the following efforts to misappropriate Palladin's confidential and trade secret documents.

170. In September of 2025, Millman used his personal email address to request access to Palladin customer Televisa Univision documents, including request for proposal ("RFP") documents (including Salesforce, FatTail, Boostr questions), a Televisa customer folder, and Sales Onboarding and Knowledge Base Structure Proposal.

171. By using his personal email account, Millman demonstrated an intent to misappropriate the documents for improper purposes, now known to be the enhancement of his position at his new employer, Perficient.

172. The documents taken in September 2025 contain competitive bidding information, commercial and technical information, and critical information about Palladin's active, revenue-generating customer relationships, as well as data provided to Palladin by its customers, partners, vendors and/or potential customers. These confidential and trade secret files are valued at no less than $1 million.

55

173. In October of 2025 Millman requested access to his personal email, to multiple documents and folders, including, but not limited to the WideOrbit folder, "Innovation" folder structure and to Televisa Univision documents, without a legitimate need or authority.

174. On January 5, 2026, shortly before 7:00PM EST, Palladin employee, and Ryan Prescott direct report, Jenn Pandiscio, resigned her position via email. At 11:46 am that morning, Pandiscio emailed CEO Ward, Prescott and two other employees that she had uploaded to Palladin's project management and talent inventory system, "Mission Control" (an app installed in Palladin's Salesforce CRM system) a "Skills" file with over 2,100 skills for Palladin's employees. These skills covered the nature and specific credentials and proficiencies of all, or nearly all, of Palladin's workforce.

175. On January 6, 2026, Palladin accepted Pandiscio's after-hours resignation from the prior evening. Later that day, Pandiscio's LinkedIn profile indicated she was employed by The Whole Group.

176. Between January 1, 2026, and February 10, 2026, Defendant Millman made 59 targeted downloads, including the "Skills SOP" (standard operating procedure) for the data Pandiscio loaded on January 5, key resource plans for large Palladin accounts, Televisa Univision confidential information and other Palladin materials.

56

177. On January 7, 2026, Millman revoked multiple Palladin employees' access to "Media 101 training video" on Palladin's Google Drive system. Millman did not have a legitimate need to deny access and did not have authority to do so.

178. On January 13, 2026, while employed by Palladin, Millman revoked multiple Palladin employees' access to "Fan Engagement Intro Deck" on Palladin's Google Drive system, which is a key, competitive presentation and core trade secret.

179. On information and belief, Millman's revocation of access was intended to misappropriate Palladin's trade secret and confidential methods of doing business which give Palladin a competitive advantage over its competition, and/or to hinder Palladin employees from finding and acting on these trade secrets.

180. Through recent investigative measures, Palladin discovered Millman, Prescott and Nguyen have engaged in a sustained, months-long campaign of accessing company intellectual property ("IP"), confidential client information, from their personal accounts and have actively revoked company employees' access to that same IP, demonstrating both intent and consciousness of guilt.

181. Forensic examination has revealed Prescott, Nguyen and Millman's actions to access and copy thousands of Palladin confidential and trade secret documents and code, without authority and with intent to misappropriate.

182.   Post-termination activities by Millman, Prescott and Nguyen are documented to reveal Millman has obtained credentials to Palladin's WideOrbit development environment through a credential transfer from a Palladin developer on November 13-14, 2025.

183.   Cross-referencing Millman's confirmed home IP address (99.228.36.76 Thornhill, Ontario -  228 CRM Production logins) against MCCORE / WideOrbit login records reveals 20 successful MCCORE / WideOrbit system access sessions from Millman's home computer through February 25, 2026 (approximately one month after Millman's January 27, 2026 resignation and subsequent to the "notice period" required by Canadian law), including six sessions after his January 27, 2026 resignation and January 28, 2026 deactivation in Palladin's primary CRM system, and two sessions after WideOrbit notified Palladin of its cancellation of the Palladin-WideOrbit relationship on February 18, 2026.

184.   Millman, Prescott and Nguyen have misappropriated tens of thousands of confidential and trade secret files, documents, images and software, enough, in essence, to steal the entire company.

185.   On information and belief, Millman's calendar data, from the time he was employed to the time he departed and shortly after he departed, revealed

significant numbers of meetings where competitors, current and former merger & acquisition "suitors," and partners of Palladin, were present.

186.   These meetings were substantively equal to the number of meetings Millman had with Salesforce in more intimate settings.  The number of meetings with Salesforce, at or about the time of his resignation, demonstrate his intent to move Palladin's Salesforce customers and relationships to Perficient.

187.   Perficient knew that Millman possessed every document necessary to pursue all customers of Palladin, including WideOrbit, Time, Outfront, Televisa Univision, and others.  Perficient knew or should have known that Millman was contractually bound not to compete and solicit customers of Palladin.  Further, Perficient knew that Millman operated at an executive level and as an officer with fiduciary duties not to undermine the business of Palladin.

188.   Millman, during and after his employment at Palladin, accessed and downloaded, himself or with the assistance of Prescott and/or Nguyen, large numbers of highly confidential and trade secret information related to systems and solution design, integration patterns & routines, Apex code, source code, customer files, customer data, pricing, bidding strategy, ways of doing business, and virtually everything needed to persuade existing Palladin customers to move to Kelley Austin/Perficient.

189.   Palladin recently discovered that Millman had taken active measures to damage customer relationships, before and after his departure from Palladin.  As an officer of Palladin, Millman had a fiduciary duty to protect and expand customer relationships; he not only failed to do so but actively subverted the business of Palladin in violation of his contractual and fiduciary duties.

190.   In early January of 2026, Millman told at least one Palladin employee to cancel a meeting with premier customer Time USA, LLC / Time, Inc. ("Time"). The substance of the meeting related to Palladin's Slack integration project underway with Time.  Millman told the employee "everything is on hold."

191.   On January 30, 2026, Palladin's CEO Ward and two other Palladin employees participated in a meeting with two Time representatives, including Time's Chief Information Officer, Sharon Milz, and Finance executive, Claudia Garay.

192.   During the meeting, Time's representatives expressed frustration with Palladin's "Slack delays." Palladin's employee confirmed that Millman had instructed the employee to cancel any forward progress meetings with Time, an instruction that interfered with Palladin's business relationship with Time.

193.   Millman's representations to Time were in violation of his contractual covenants to use best efforts to expand the business of Palladin and in violation of

his fiduciary duties in that his activities with Time are detrimental to Palladin's relationship with Time.

194.   Millman's interference with Palladin's business relationship with Time coincided with his efforts to undermine Palladin's relationship with Salesforce, Televisa Univision, The Washington Post, and others.  Evidence of Millman's interference became visible when in early 2026 Palladin's senior management began receiving messages from Salesforce suggesting that Palladin would not have a relationship with Salesforce in 2026 and propagating such rumors to Palladin employees and even across Palladin's leadership team.

195.   On February 9, 2026, at a regular Executive Committee meeting, Palladin's leadership team was informed that Millman was joining Palladin's competitor Kelley Austin/Perficient.  On February 10, 2026, Palladin's CEO Ward told Millman in a phone conversation that Ward was informed Millman was joining a direct competitor, to which Millman responded "you don't have a direct competitor, you don't have a Salesforce partnership business anymore."

196.   Millman's comments are a projection of what he believed he had accomplished – the complete disruption of Palladin's relationship with Salesforce. The comments further demonstrate a willful, wanton and deliberate effort to undermine Palladin's customer base, as well as the desire to jeopardize Palladin's nature as a going concern, in violation of his contractual and fiduciary duties.

61

197.   Palladin's CEO Ward reminded Millman of his obligations to maintain the confidentiality of Palladin's trade secrets, to which Millman responded "I brought you my intellectual property." This is not only a false statement, but one that reflects an intent not to abide by his contractual and fiduciary obligations. In fact, a review of the Setup Audit Trail of the "MCCORE" (Media Cloud on Core) WideOrbit development system, accessed by Millman from his homes, known on information and belief, to be in Ontario, Canada, Florida and elsewhere, shows no evidence of any username associated with Millman as having configured, developed or contributed any intellectual property to this system.

198.   As Perficient's now Head of Media, everything Millman misappropriated from Palladin, and every action he undertook to damage Palladin's customer relationships, will be used to solicit Palladin's existing customers and take prospective customers from Palladin.

199.   As officers of Palladin, Millman, Prescott and Nguyen had fiduciary duties and contractual obligations to protect the commercial interests of Palladin. In downloading trade secret information during and after their employment, and sabotaging Palladin's customer relationships, Millman, Prescott and Nguyen breached those duties and obligations, causing harm to Palladin.

200.   In furtherance of their conspiracy to harm Palladin and benefit themselves, Millman and Prescott have made disparaging comments about Palladin

executive personnel and have encouraged Palladin employees to leave. Prescott instructed multiple Palladin employees to avoid communicating with Palladin's CEO and customers, all in violation of Prescott's contractual covenants and fiduciary duties.

201. Millman, Nguyen and Prescott have breached the non-solicitation, non-disparagement, and non-disclosure terms of their employment agreements, causing harm to Palladin.

202. Millman, Prescott and Nguyen's misappropriation of trade secrets was done at least in part with the cooperation of other unknown actors.

203. Millman, Prescott and Nguyen signed binding employment agreements, the terms of which were honored by Palladin.

204. Nguyen signed his employment agreement on April 21, 2024, taking the position of Senior Technical Architect. By signing his employment agreement, Nguyen agreed to keep confidential and preserve the trade secrets of Palladin and he further agreed to non-solicitation and non-disparagement covenants contained in the agreement.

205. As Senior Technical Architect, Nguyen had access to Palladin computer systems and was responsible for designing and building critical source code used with major Palladin customers and partners, including WideOrbit. He was hired as the lead technical employee for the company.

206.   On May 5, 2025, Palladin promoted Nguyen to Technical Architect/Development Lead, a position that gave him access to most if not all of Palladin's confidential and trade secret files and data.

207.   Nguyen resigned from Palladin on February 9, 2026, within days of Millman's resignation.  Palladin terminated Nguyen on February 19, 2026, after Palladin discovered he had made massive downloads, shown by forensic information to be dozens of thousands of digital files, from Palladin's Google Drive of all or all Palladin client folders and other confidential and trade secret information.

208.   On information and belief, Nguyen assisted Millman in gaining unauthorized access to Palladin confidential and trade secret documents and data. From December 1, 2025, past Nguyen's termination date of February 19, 2026, Mr. Nguyen accessed proprietary Palladin systems, downloaded thousands of files containing confidential and trade secret information, including 37,000+ files the evening before his resignation. This has become known to Palladin only through Palladin's recent forensic examination of its computer systems.

209.   Nguyen orchestrated a systematic, multi-phase exfiltration campaign escalating from targeted downloads of key project documents to a massive, automated bulk exfiltration exceeding 37,000 files in a single overnight session on February 8-9, 2026, followed by final Google Takeout exfiltration of Nguyen's

"My Drive" documents (which may have contained additional Company confidential information, et al) through February 18, 2026. Nguyen did not have authority to access and download any of these files, and he did so in violation of his contractual and fiduciary obligations.

210. All misappropriated documents, folders and files were confidential and trade secret and taken without permission or authority, and included files and data to which Nguyen, as an officer, had access from Palladin's Google Drive system. By way of example, files taken on February 8-9, 2026, included over ten years of Palladin's operational files, including approximately:

14,417 JPEG/PNG image files including screenshots, diagrams, and architecture visuals;

7,515 PDFs including standard operating procedures ("SOPs"), signed contracts, meeting notes, and guides;

4,547 other files (CSV, JSON, ZIP, txt, HTML and code) including Outfront Media CSVs, API configs, source code, proofs of concepts, business innovation documents, data migration templates, Palladin and client customer and other data, system logs, and other data exports;

3,276 spreadsheets (Excel and Google Sheet documents), including pricing, data mapping, and financial models;

2,192 Google Docs files including discovery notes, project plans, solution designs, methodology templates, reference information, and SOPs;

1,806 video files (MP4/QuickTime/MPEG including statements of work ("SOWs"), proposals, client demonstrations, Palladin demonstrations / IP overviews, and technical information);

2,079 Presentation files (Google Slides and PowerPoint), including client decks, partner sessions, architectural blueprints, intellectual property and internal trade secret materials, consulting methodologies, client and prospect information, and strategy.

Possession of these documents, and others that were misappropriated, would enable a competitor to "acquire" Palladin for free.

211.    Nguyen's unauthorized access to Palladin's confidential and trade secret files included access and downloading by a System Administrator account associated with Nguyen's Palladin email address in one of Palladin's WideOrbit / Media Cloud IP systems.  Palladin has determined that the System Administrator account is attributable to Tuan Nguyen's email address and his IP address in Pasadena, California.

212.    On information and belief, Millman, Prescott and Nguyen made unauthorized downloads of WideOrbit and other Palladin customer and partner files ("OF TDD" aka Outfront Media's Technical Design Document) for

subsequent use at their respective new employers, in the case of Millman, Perficient. These requests were made verbally, and/or in writing between Prescott and Nguyen, via Palladin's own enterprise messaging systems.

213. The timing of these actions with regard to Palladin trade secrets and client property is emblematic of the coordination of individual Defendants, and indicative of the extent to which the "shadow organization" within Palladin existed with ulterior motives, and, the existence of which, allowed Defendants to not just conspire, but to unjustly enrich themselves at the expense of Plaintiff.

214. The off-hours nature, use of electronic communications across state and international boundaries in furtherance of the scheme and concealment of these activities clearly demonstrates intent to defraud.

215. As of February 2026, which overlaps with his employment at Palladin, Nguyen is now employed by Whole Group, a direct competitor of Palladin. Whole Group markets "agentic CRM," "Lead-to-Cash," and AI-powered service products built on an Anthropic AI platform.

216. Nguyen's downloads of trade secret Palladin documents will give Whole Group an unfair competitive advantage, and Whole Group has knowledge and possession of those documents. Such data is critical to Palladin's market position in its Salesforce and AI practices. Nguyen has harmed Palladin by allowing Whole Group to possess and use Palladin's confidential information.

217. Nguyen is in possession of trade secret information that benefits or will benefit Whole Group by providing Whole Group access to WideOrbit connector code and architecture, as well as a multitude of competitive information, structured and unstructured data that Whole Group can use in its AI practices.

218. Whole Group has recently hired at least two (2) other former Palladin employees who have intimate knowledge of Palladin's business methods and trade secrets, including Jenn Pandiscio. On information and belief, Nguyen and Pandiscio coordinated their departure, one soliciting the other, to leave Palladin and join Whole Group.

219. Other documents taken by Nguyen that will provide benefits to Whole Group, and to Perficient if shared with Millman, include Apex source code and classes, integration architecture, customer data, pricing roadmaps, commercial contracts, pricing and trade practices, Salesforce implementation IP, media industry workflow configurations, customer lists, pricing and pipeline data, product roadmaps and strategic plans, proprietary methodologies, diagrams, drawings, and client data under confidential agreements, and the ability to leverage this to competitive advantage with AI technology.

220. On information and belief, other benefits Nguyen gained by misappropriating trade secret and confidential information include that he could

pass this information to multiple third parties, likely to Defendant Perficient, as a personal favor to Millman, or for pecuniary gain.

221.    Whole Group, through Nguyen, stands to gain direct technical acceleration through Palladin's misappropriated documents, files, trade secrets, contracts, designs, architectures, solutions, digital assets, corporate initiatives, as well as WideOrbit connector code, Apex classes and integration architecture that will give Whole Group an instant jumpstart on media industry workflows without having to spend research and development investment funds.

222.    Whole Group positions itself as the "agentic business" leader.  With Palladin's stolen Agentforce/AI work, customer /partner data (aggregated over eleven (11) years), stolen trade secret documents and know how, Whole Group will be able to compete against both Palladin and Palladin's Salesforce-partnerships and past, present and prospective customer base simultaneously.

223.    As an officer of Palladin, Nguyen had fiduciary duties and obligations to protect the commercial interests of Palladin.  In downloading trade secret information during his employment, he breached those duties and obligations, causing harm to Palladin.

224.    Nguyen breached the non-solicitation and non-disclosure terms of his employment agreement, causing harm to Palladin.

225. On February 23, 2026, Nguyen made multiple successful unauthorized access to Palladin computer systems. On two attempts, Nguyen gained access to additional trade secret documents under the username in Palladin Media Cloud / WideOrbit development system "STORM" under admin1.tuan@media258.pre from an OAUTH Connected App, "storm_auth".

226. On information and belief, this app was authored by Nguyen or a delegate of Defendants Nguyen and Millman so as to allow direct (bypassing traditional security measures) API access to the system, via two (2) IP addresses in Ashburn, Va within 40 minutes of one another, at 10:14AM and 10:54AM. These IP addresses were logged by the STORM system as 18.215.133.158 and 52.86.79.134. This occurred four (4) days after Nguyen's employment with Palladin had ended.

227. On information and belief, subsequent to the date of his resignation, Millman made eighteen (18) attempts to log into the Media Cloud / WideOrbit development org "STORM" under the username "wideorbit@wideorbitmedia.com" from Millman's home IP address of 99.228.36.76, of which eight (8) were successful. Of these eighteen access attempts to this one system, eight (8) unique access attempts from the same IP address post-dated the end of Millman's Notice Period under Canadian Law

(February 20, 2026) and occurred more than thirty-five (35) days subsequent to Millman's resignation from Palladin on January 27, 2026.

228.   Nguyen accessed Palladin's Media Cloud/WideOrbit development organization(s) which included proprietary connector software, integration code, Fusion API-related code, and development assets that are Palladin confidential and trade secret documents.  Nguyen successfully accessed Palladin's proprietary Salesforce development org twice using programmatic API methods from an Amazon Web Services cloud infrastructure.

229.   On information and belief, Nguyen obtained additional Palladin WideOrbit documents and files, after both he and Millman were no longer at Palladin, to deliver the documents to Millman for use at Perficient to obtain or strengthen Perficient's WideOrbit partnership, to the detriment of Palladin.

230.   On information and belief, Nguyen has continued unauthorized access to critical Palladin files.  With administrative-level API access through a connection made by Nguyen, and traceable to Nguyen's user account in that system, Nguyen has the technical capability to extract all metadata, source code, and data from this org using standard Salesforce API calls (e.g., Metadata API, Tooling API, REST/SOAP APIs).

231.   Prescott was and remains an active participant in the conspiracy to misappropriate Palladin trade secrets.

232.   Forensic analysis has revealed that Prescott generated 136 MFA-blocked CRM production login attempts from his Biddeford, Maine home IP (45.47.91.47 total 256 CRM logins) over a five-month period ending on or around the time of Nguyen's termination.

233.   Together with forensic analysis of Millman and Nguyen activities, the forensic analysis integrates login data from three Salesforce environments operated by Palladin to establish, through IP address cross-referencing, comprehensive evidence of a chain of unauthorized post-resignation and post-termination systems access by the employee Defendants.

234.   On information and belief, at least two independent evidence chains establish coordination between Millman and Nguyen to exfiltrate trade secret documents.  First, Millman twice attempted to log into the MCCore development organization using one of Nguyen's username accounts (mccore0801250953@demo.org) from Millman's Thornhill Ontario IP address on November 7, 2025 and January 7, 2026.  Second, the November 13-14, 2025, credential transfer analyses show a multi-step, real-time coordination between Nguyen (who created the generic account) and Millman. Lucas Viacava, an employee whose user account in the "MCCORE" system was created by Nguyen, created a generic "Wide Orbit Demo User" account, "mccore0801250953@demo.org," on November 13, 2025.  On November 14,

2025, after an unsuccessful login attempt from Millman's Thornhill, ON IP address, Viacava reset the user account password from Buenos Aires at 09:33:18 Pacific Time. At 09:34:00 PT the Thornhill login succeeded.

235. On information and belief, all three former officer employees of Palladin demonstrated persistent, willful, unauthorized and successful attempts to access Palladin systems after resignation and termination, as well as unauthorized access while employed by Palladin.

236. On information and belief, the WideOrbit / Media Cloud system access specifically targeted Palladin's proprietary media industry connector IP – software representing a significant development investment. With respect to WideOrbit, the exfiltration of sensitive trade secret information will help Palladin's competitors gain greater Salesforce business.

237. As an officer of Palladin, Prescott had fiduciary duties and obligations to protect the commercial interests of Palladin. In downloading trade secret information during his employment, he breached those duties and obligations, causing harm to Palladin.

238. Prescott further breached fiduciary duties by allowing, and facilitating, Millman's mismanagement of his sales team. On information and belief, Prescott disparaged company management, including Palladin CEO Ward, to Palladin employees, customers and Salesforce, and solicited employees to leave

the company over a period encompassing the majority of calendar year 2025, and when Prescott was in receipt of the substantial "phantom equity" incentive program and document, which he never signed.

239.   Defendants Millman's and Prescott's refusal to execute the "phantom equity" agreements presented to them in August 2025 occurred at a point in time before Palladin's operating revenues had, in fact, substantially diminished, prior to any acquisitive LOI had been presented or signed, prior to Palladin's downgrade by Salesforce, in advance of the WideOrbit / Aria / OrgPAL announcements at Dreamforce25 in October, 2025 and before any reasonable basis existed to disbelieve that such phantom equity agreements would yield substantive "upside" for the signor, and just prior to Palladin's announcement as a Salesforce Summit tier partner.

240.   Refusing this substantial "free upside" contingent on the sale of Palladin, which would substantially enrich Prescott and Millman, is economically irrational, and indicative of intent, motive and knowledge of the events that would play out over subsequent months. Thus, refusal to sign these phantom equity agreements is evidence of prior intent.

241.   On information and belief, Prescott breached the non-solicitation and non-disclosure terms of his employment agreement, causing harm to Palladin,

including, but not limited to, offering to steer prospective business to partners other than Palladin.

242. Perficient competes with Palladin. Perficient acquired Palladin's direct competitor Kelley Austin. Kelley Austin competes with Palladin as a Salesforce consulting partner, generally, and with a focus on the Telecommunications-Media-High Technology ("TMT") vertical grouping. The TMT grouping is one dimension by which Salesforce organizes its departments, including Sales and Partner Sales Management, key relationship centers, and sources of prospective business to consulting partners with this industry focus.

243. On information and belief, Perficient/Kelley Austin hired Millman, knowing that Millman and Lacy Thomas would solicit Palladin's customers and personnel in violation of Millman's employment agreement and fiduciary duties. On information and belief, Perficient has or is likely to receive Palladin's confidential and trade secret information from Millman and use that information for an unfair competitive advantage which has and/or will harm Palladin.

244. Perficient has misappropriated confidential and trade secret information by hiring Millman who has knowingly and intentionally taken such information from Palladin with the explicit intent of targeting Palladin's key customers and Palladin's employees, as evidenced by Millman's words and actions as logged in Palladin's Google Drive system.

245.    Millman, Prescott and Nguyen took actions and inactions to sabotage Palladin's relationship with its customers, Outfront Media, Televisa Univision, other customers, and key 2026 channel partner, WideOrbit. When Nguyen gained access to Palladin's computer systems on February 9, 2026, the files he downloaded included about 450 Outfront files, about 147 WideOrbit files related to API mappings, and 310 Televisa Univision files.

246.    On February 10, 2026, Outfront Senior Vice President of Sales indicated Outfront's last day with Palladin would be February 13, 2026.  On information and belief, the actions and inactions of Millman, Prescott and/or Nguyen caused Outfront's departure.  Millman, Prescott and Nguyen violated their contractual and fiduciary duties to damage Palladin's relationship with Outfront.

247.    On information and belief, Millman has solicited and Prescott has redirected business from Outfront for themselves and their new employers, both before and after their employment with Palladin, in violation of their non-solicitation covenants. The conservative, reasonable estimate, prepared by Prescott, Millman and their direct reports, and recorded in Palladin's own CRM system, represents at least $1.2 million dollars in revenue to Palladin in support work alone, until such time as a larger "Phase 2" was to begin, in late 2026, according to Defendant Prescott.

248.   Following Defendant Millman's departure to Perficient in February 2026, Defendant Millman formed a new LinkedIn connection with Steven Smithwick, a former Palladin Vice President of Sales.

249.   Smithwick's tenure at Palladin started in February, 2022, at the recommendation of then-contracted Board Advisor, Ernie Riddle, and ended approximately eight (8) months prior to Millman's employment start date, in early July 2023.

250.   On information and belief, Millman had no prior professional or personal dealings or interactions with Smithwick.  On information and belief, Smithwick is currently employed by IDI Billing Solutions, the billing software vendor used by Palladin customer Arvig.

251.   Following the Smithwick-Millman LinkedIn connection, Palladin's loyal client, Arvig Enterprises of Perham, Minnesota, began to withhold and delay invoice payments without explanation under the Master Services Agreement between Palladin and Arvig. Such delays are demonstrably unusual in the 5-year relationship between Palladin and Arvig, which was initially established in 2021 by CEO Ward.

252.   Separately, during the week ending April 17, 2026, Ernie Riddle, a former employer of Palladin CEO Ward while Riddle was Chairman at a Salesforce partner, EnablePath, called Ward to "catch up on a private equity

buyer". Mr. Riddle served as a contract advisor to Palladin from 2021 through May, 2023. Riddle spoke with Palladin CEO Ward on April 17, 2026, representing himself as having access to a private equity buyer for Palladin.

253. Mr. Riddle is the father of former Slalom Salesforce practice director Bethany Riddle, the person to whom Jennifer ("Jenn") Pandiscio, one of the Palladin employees now at The Whole Group, told Palladin CEO Ward on December 26, 2025 that Smithwick had "been funneling Palladin leads to" Bethany Riddle.

254. Mr. Riddle has a documented prior commercial relationship with Tequity Advisors. Tequity served as the exclusive financial advisor to Birlasoft (a CK Birla Group subsidiary) in its January 2014 acquisition of EnablePath, of which Riddle was then President.[25] These connections, individually and collectively, evidence the persistence of relationship networks that have mobilized to interfere with Palladin's commercial interests in, and prior to, 2026.

255. Millman contacted employees of Palladin after his departure to solicit them to leave, in breach of his fiduciary and contractual covenants. In addition, on at least one occasion, he solicited the assistance of Palladin employees to forward

---

[25] https://www.tequityadvisors.com/transactions/enablepath-was-acquired-by-birla-soft

confidential information to provide him with access to Palladin's systems so that he could misappropriate this information himself.

256. On information and belief, after leaving Palladin, Millman accepted a business meeting with at least one of Palladin's customers, Televisa Univision, in violation of his non-solicitation obligations. This meeting was organized by a representative of Salesforce. Prior to leaving Palladin, Millman took files related to that customer, including in the month of January 2026, which he now uses to solicit the Palladin customer's business for Perficient.

257. Several former employees of Palladin have either refused or unduly delayed the return of their company computers. Nguyen returned his computer "wiped" of any data or files. Millman has failed to return his company laptop computer as required by company policy, even after constant and repeated demands for its return. Millman has no legitimate reason to withhold the company laptop computer. On information and belief, Millman's refusal to return the computer is believed to evince an intent to withhold evidence relevant to the claims made herein.

258. On March 27, 2026, Millman phoned Palladin's CEO Ward and attempted to "trade" the Palladin computer in his possession for some of the trade secrets he had misappropriated. Millman claimed to "own" software "accelerators" related to WideOrbit, even though the MCCORE / WideOrbit setup

trail has no evidence of any development contribution by Millman.  Even if Millman had developed any of the accelerator code, any software developed by an employ of Palladin is owned by Palladin.

259.   In the same conversation, unprovoked, Millman expressed to Palladin CEO Ward that Millman had, "no non-solicitation agreement. I can steal all your customers if I wanted to; I had hoped this would be amicable."

260.   Palladin's investigation uncovered proof that no work product attributed to Millman appears in either of two WideOrbit developer organizations.

261.   Millman's March 27, 2026 phone call confirms two salient facts: he possesses Palladin trade secret information and he has no intention of returning Palladin's computer unconditionally as he is required to do.

262.   On April 9, 2026, Palladin CEO Ward learned that The Washington Post would not renew its support agreement in place with Palladin since January 2025, offering little to no explanation.  The Washington Post had interactions with Millman while he was employed at Palladin.  On information and belief, Millman is now soliciting The Washington Post to become a customer of Perficient in violation of Millman's fiduciary duties and contractual covenants.

## COUNT I

## VIOLATIONS OF THE FEDERAL DEFEND TRADE SECRETS ACT

### (against all Defendants)

263. Plaintiff repeats and re-alleges the allegations set forth above as if fully set forth herein.

264. The Defend Trade Secrets Act ("DTSA") of 2016 forbids threatened and actual misappropriation of trade secrets "if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce."

265. "Trade Secrets" are broadly defined under the DTSA to include "all forms and types of financial, business, scientific, technical, economic, or engineering information."

266. During their employment, Defendants Millman, Prescott and Nguyen had access to confidential and proprietary information which constituted Palladin's confidential and trade secret information.

267. This information included customer pricing and quote information, customer names and related sales information, customer contact information, confidential customer agreements, market research materials including pitch decks, software and documents created specifically for building and operating a

WideOrbit development environments, Salesforce relationship documents, CRM production documents, technical integration documents, among others.[26]

268. Palladin's sales-related trade secrets are not disclosed by Palladin except to members of its staff who are given direct access to customer leads, pricing, market research, and sensitive financial and business strategy materials to effectively expand Palladin's business and provide competitive pricing. Palladin's proprietary sales information is confidential and is not available to Palladin's customers or competitors.

269. Palladin's customer lists, pricing materials, market research and sensitive financial and business strategy materials are valuable to Palladin because they are not known by individuals outside the organization, as that information provides Palladin with a competitive advantage in selling its services.

270. Palladin has expended substantial time, effort and expense developing its trade secrets, including training its specialized Salesforce employees and other employees to document customer interactions and maintain accurate records of customer preferences and purchasing history, developing and refining its pricing strategies through years of experience it its market space, and contracting with and

---

[26] This is just a sampling of the substance of more than dozens of thousands of files that Millman, Prescott and Nguyen misappropriated during and after their employment at Palladin.

paying significant expenses to third parties to assist in the development of its sales strategies.

271.   Palladin has taken numerous steps to protect its trade secrets, including enacting policies to prevent exfiltration of its trade secrets, including enacting data access and security controls, requiring unique credentials, partitioned sharing of key folders and systems data that allow access Palladin trade secrets, and implementing data loss prevention systems to alert Palladin to any potential exfiltration of trade secrets.

272.   Palladin's executive level employees and officers, those that have more access to company electronic files than other employees, have employment agreements in which they contractually agree to protect and not exfiltrate trade secret information.  Those that are considered officers, including Millman, Nguyen and Prescott, have further fiduciary responsibilities to Palladin, including, but not limited to, the obligation to protect and not exfiltrate trade secrets on account of their having fiduciary obligations to Palladin.

273.   The employee Defendants misappropriated Palladin's trade secrets by acquiring them from Palladin's electronic resources, knowing it was improper for them to do so.  Defendant Perficient is the recipient of at least a portion of those trade secret and confidential materials, and of trade secret business methods and

data in the possession of Millman, whose natural purpose is to use and/or convey those materials to his new employer, Perficient.

274. Perficient competes directly with Palladin at least through its subsidiary Kelley Austin.

275. On information and belief, the employee Defendants have no legitimate reason to engage in such substantial misappropriation of Palladin's confidential, trade secret and proprietary information if not for the purpose of obtaining an unlawful competitive advantage, either independently or in conjunction with their current employers, including with respect to Millman, Perficient.

276. Palladin's trade secret information is (1) not known outside Palladin; (2) known only by select Palladin employees, including former employees Millman, Prescott and Nguyen; (3) subject to reasonable measures to guard the secrecy of the information, including Palladin's policies and confidentiality agreements; (4) valuable; and (5) difficult for others to properly acquire or independently duplicate.

277. If Palladin's software development, customer contracts, architectural plans, marketing materials and business strategy documents were to fall into the hands of a competitor, the competitor could use these documents to undercut

Palladin and gain an unlawful advantage in the marketplace. On information and belief, those materials have already fallen into at least Perficient's hands.

278. Palladin's trade secret information is related to numerous clients and partners, and is used in, or intended for use in, interstate commerce.

279. Defendants Millman, Prescott and Nguyen knew they had a duty, pursuant to their employment agreements and Palladin's policies, to maintain the secrecy of Palladin's trade secrets.

280. Unless ordered by this Court to cease misappropriating trade secrets, Defendants Millman, Prescott and Nguyen will be able to use Palladin's trade secret information to directly compete with Palladin, or at least deprive Palladin of its legitimate business relationships, including its relationship with Salesforce, resulting in lost income.

281. Perficient, as the new employer of Millman, if not enjoined, will unlawfully gain access to Palladin's Salesforce customers, partners, and other relationships, through a pipeline between Millman at Perficient and Prescott at Salesforce.

282. Upon information and belief, the employee Defendants have also used Palladin's trade secret information without Palladin's knowledge, consent, or authorization to benefit themselves and/or their new employers in a manner that

will cause irreparable harm to Palladin.  Perficient's use of Palladin's trade secret and confidential information will damage Palladin.

283.   Defendants' actions constitute actual and continuing misappropriation in violation of the DTSA.

284.   Palladin has suffered damages and irreparable harm because of Defendants' violations of the DTSA.

285.   Palladin is entitled to recover actual damages.

286.   Palladin's damages cannot be adequately compensated through remedies at law alone, thereby requiring both equitable and compensatory relief.

287.   Defendants' actions will continue to cause irreparable harm and damages to Palladin if not restrained by court injunctions and other necessary orders.

## COUNT II
## BREACH OF CONTRACT – RESTRICTIVE COVENANTS
### (against Millman, Prescott and Nguyen)

288.   Plaintiff repeats and re-alleges the allegations of paragraphs 1 through 262 above as if fully set forth herein.

289.   As described above, the employment contracts containing the pre- and post-termination covenants are valid contracts entered into by Millman, Prescott and Nguyen.  Palladin complied with all terms and conditions set forth therein and is entitled to enforce same.

290.   The covenants prohibit Millman, Prescott and Nguyen from (i) disparaging Palladin, its employees, officers, and management; (ii) seeking and obtaining direct or indirect employment with a Palladin competitor until at least February 20, 2027 (Millman), January 7, 2028 (Prescott) and February 19, 2028 (Nguyen), (iii) soliciting Palladin's customers, suppliers, distributors, referral sources, consultants, independent contractors, representatives, partners, or other business relations through the periods referenced in (ii), above; and (iv) using, appropriating or disclosing Palladin's  confidential information and trade secrets.[27]

**Defendants' Breach By Disparagement**

291.   On information and belief, Millman and Prescott have made disparaging remarks about Palladin's capabilities to Palladin's partner WideOrbit and Palladin customers.  The remarks included statements and actions that led WideOrbit to believe he (Millman) was the "sole gateway" into Palladin, when in fact Palladin had ample resources to satisfy the needs of WideOrbit.

292.   On information and belief, in 2025 Millman made unfair and deliberately harmful statements to Palladin employees in comparing Palladin to its competitor Kelley Austin around the time that Perficient acquired Kelley Austin.

---

[27] Millman's post-termination period was limited to twelve (12) months, rather than the two years specified in the Prescott and Nguyen employment agreements.

293.   On information and belief, in 2025 and 2026, Millman and Prescott made disparaging comments to Palladin's employees and Palladin's customers about Palladin's management team and its CEO Ward. Further, Prescott made disparaging remarks in Palladin's Slack system, and aloud, to Palladin employees about Palladin's key partner, Salesforce and its senior leadership, with remarks in writing, including:

> *"Let's help them. F…k Salesforce"; "Salesforce has created this toxic environment where we are forced to hate each other. Ultimately, Brad [Pruner] and David [Fan] have created the reason their entire product will fail in AMER. The current partner environment is that your current partner is an idiot and 'we' know better"; "If it helps, I'm way more charming than any f…king Salesforce leader"; "CD [Christopher Dean], Salesforce is building a team that aligns to the CTO office, it's a bulls..t thing but that's what it means"; "Wait. Are we saying Salesforce developed something that actually helps customers and partners?" (sarcastic); "…"If we're having to do rework due to Salesforce screw ups"; "Still feel like Salesforce is trying to cover their asses"; "Well…salesforce making someone's life/job easier was not on my bingo card for this week" (sarcastic)*

294.   Defendants' disparagement of Palladin, its employees and its key partner, Salesforce, constitutes breach of the employee Defendants' employment agreements and has caused damage to Palladin. Palladin is entitled to recover actual damages.

295.   Palladin's damages cannot be adequately compensated through remedies at law alone, thereby requiring both equitable and compensatory relief.

296.   Defendants' actions will continue to cause irreparable harm and damages to Palladin if not restrained by court injunctions and other necessary orders.

## Defendants' Breach By Solicitation

297.   The pre- and post-termination restrictive covenants forbid Millman, Prescott and Nguyen from soliciting Palladin's customers, business partners, partners and vendors on behalf of their new employers.

298.   Nguyen has joined Whole Group where at least two (2) other former Palladin employees have become employees.

299.   On information and belief, Nguyen solicited one or more Palladin employees, with or without the help of Millman and Prescott, to leave Palladin and join Nguyen at Palladin's competitor Whole Group.

300.   After he departed from Palladin, Millman made repeated attempts to communicate with Palladin's employees through text messages and telephone calls - all in violation of his covenant not to solicit employees.

301.   On information and belief, Millman and Prescott solicited Palladin's partner WideOrbit and Palladin's customer Outfront, by falsely attributing WideOrbit and Outfront's relationship with Palladin solely and exclusively with Millman and Prescott so that when both employees resigned, WideOrbit and Outfront would abandon Palladin, which in fact they did.

302.   On information and belief, during and after their employment at Palladin, Prescott and Millman misappropriated highly confidential customer files, including those for Palladin's customer Televisa.  After Millman joined Perficient, Salesforce accidentally forwarded details of a meeting that Millman was going to have with Televisa, as a Perficient employee, to Millman's Palladin email address. On information, the purpose of the meeting was to solicit Televisa's business, using trade secret information misappropriated from Palladin.

303.   Defendants' solicitation of Palladin employees and customers constitute breach of the employee Defendants' employment agreements and has caused damage to Palladin. Palladin is entitled to recover actual damages.

304.   Palladin's damages cannot be adequately compensated through remedies at law alone, thereby requiring both equitable and compensatory relief.

305.   Defendants' actions will continue to cause irreparable harm and damages to Palladin if not restrained by court injunctions and other necessary orders.

## Defendants' Breach By Misappropriation of Trade Secrets

306.   The employee Defendants were contractually bound not to misappropriate confidential and trade secret information.

307.   The employee Defendants have misappropriated thousands of documents that include customer files containing proposals, bids, pitches, pricing

90

information, contacts, and virtually everything needed to maintain Palladin's customer relationships.

308.   On information and belief, on February 23, 2026, Nguyen gained access to Palladin's WideOrbit/Media Cloud development system(s) – where much of Palladin's trade secret documents are stored - related to its partner/customer WideOrbit.  On the same day, and within a forty (40) minute window, Millman attempted to gain access to the same documents.  Both the access, and attempted access, occurred after Nguyen and Millman were no longer employed by Palladin. Neither Nguyen nor Millman had authority to gain access to Palladin's WideOrbit documents.

309.   Nguyen's access, and Millman's attempted access, were captured directly from the Salesforce Login History audit log for the Palladin-owned WideOrbit/Media Cloud development organization (interchangeably, "org", "system", "environment").  This org contains proprietary connector software, integration code, and development assets that constitute protected trade secrets of Palladin Technologies.

310.   Among other things, Nguyen gained access to Palladin's proprietary systems and files, so as to use and/or sell the trade secret WideOrbit Connector source code, integration configurations, and development assets for personal and professional gain.  The WideOrbit Connector is proprietary to Palladin, and a trade

secret "connector" (productized integration development to connect WideOrbit and Salesforce's Media Cloud products) developed by Palladin to connect WideOrbit's media management platform with Salesforce.

311. The WideOrbit connector represents significant development investment and constitutes a core trade secret. As such, the connector would offer Salesforce significant value, financial benefit to Prescott and Millman, and ingratiate Millman and Prescott to many senior leaders at Salesforce, advancing their careers at the expense of Palladin. On information and belief, such senior Salesforce leaders include David Fan[28] and Christopher Dean, and Senior Vice President & General Managers, Telecom, Media and Entertainment, Gerard "Jerry" Popescu, and others attendant on the Salesforce-WideOrbit-Palladin "sync" meeting series.[29]

312. On information and belief, the employee Defendants have downloaded and accessed thousands of Palladin files containing confidential and trade secret information, without authority, and with the intent of using such files at their new places of employment for their personal gain and to the detriment of Palladin.

---

[28] https://www.linkedin.com/in/david-fan-ym/
[29] https://www.linkedin.com/in/cdean/

313.   Defendants' misappropriation of Palladin's confidential and trade secret information is in breach of their employment agreements and has caused damage to Palladin. Palladin is entitled to recover actual damages.

314.   Palladin's damages cannot be adequately compensated through remedies at law alone, thereby requiring both equitable and compensatory relief.

315.   Defendants' actions will continue to cause irreparable harm and damages to Palladin if not restrained by court injunctions and other necessary orders.

**Defendants' Breach By Joining Competitors**

316.   Millman, Prescott and Nguyen have accepted employment with Perficient, Salesforce and Whole Group, respectively.  Each new employer competes with Palladin and would benefit from having access to Palladin's proprietary WideOrbit documents and code and Palladin's customer files which include bidding documents, pricing schemes, and methods of doing business.

317.   Although not a direct competitor, Salesforce will benefit by partnering with Perficient to assist Millman to solicit business from Palladin's former and current customers.

318.   On information and belief, there can be no other reason to misappropriate Palladin's trade secret customer documents, including the

93

WideOrbit connector code, except to compete with Palladin or to sell or otherwise commoditize Palladin's trade secrets to Defendants' financial gain.

319. The employee Defendants have not assured Palladin that they will not violate the restrictive post-termination covenants of their employment agreements.

320. Accepting employment with Palladin's competitors is a violation of their respective employment agreements and their fiduciary duties to be dedicated to Palladin's business. Negotiations for their new positions had to occur while they were employed by Palladin, at times they should have been expanding Palladin's business interests.

321. The employment agreements require each of the employee Defendants to disclose the name of their post-termination employers and to indicate their new titles and job descriptions. Millman, Prescott and Nguyen breached their respective post-termination restrictive covenants by failing to do so. Such information was withheld deliberately to avoid drawing suspicion and prompting early termination at a time when additional trade secrets were being exfiltrated.

322. Millman, Prescott and Nguyen have not, and cannot, claim that they do not have any overlapping job responsibilities between Palladin and their new employers, as their new positions involve contracting and negotiating contracts on behalf of their new employers, with customers overlapping and intersecting Palladin's historical, present and prospective customer base.

94

323. Millman, Prescott and Nguyen also breached the post termination covenants not just by accepting positions with competing entities, but by doing so with a treasure trove of competitive information that will put their new employers at an unfair competitive advantage.

324. Millman, Prescott's and Nguyen's breaches are ongoing.

325. As a consequence of the foregoing, Palladin will suffer irreparable harm and other losses.

326. Palladin is entitled to damages and a declaratory judgment enforcing the terms of Millman, Prescott and Nguyen's employment agreements, including the post termination covenants.

327. Despite repeated requests for the return of his Palladin computer, Millman has not complied with his obligation to do so. Palladin's computers contain trade secret documents, unless unlawfully wiped clean. While Nguyen returned his company computer, he breached his contractual duty to return his computer un-wiped. Millman has yet to return his computer, despite numerous requests to do so.

328. Millman is presently in breach of Palladin policies that require immediate return of company computers.

329. Under the terms of their employment contracts, Millman, Prescott and Nguyen have agreed that Palladin would be irreparably harmed by a breach of

confidentiality, non-disparagement, non-compete, and non-solicitation provisions of their agreements. Palladin is entitled to injunctive relief for all breaches noted above.

## COUNT III
## BREACH OF FIDUCIARY DUTY AND DUTY OF LOYALTY
### (against Millman, Prescott and Nguyen)

330. Plaintiff repeats and re-alleges the allegations of paragraphs 1 through 262 above as if fully set forth herein.

331. Millman, Prescott and Nguyen were, at all relevant times, employees and agents of Palladin. Defendants were given access to Palladin's confidential information for purposes of furthering Palladin's interests. As part of Millman, Prescott and Nguyen's employment with Palladin, and based on their status has executives, employees and agents of Palladin, Georgia law and common law imposes upon them certain fiduciary duties to the company, including duties of loyalty and good faith.

332. The duty of loyalty requires Millman, Prescott and Nguyen to act in the best interests of Palladin, from self-interest. As fiduciaries, they were prohibited from using their position at Palladin to gain a personal advantage at the expense of Palladin, or from taking corporate opportunities for themselves.

333.   While employed by Palladin, Millman and Prescott took affirmative steps to prevent Palladin from being acquired at a fair price by at least two different entities, in breach of their fiduciary duties.

334.   While employed by Palladin, Millman and Prescott made disparaging remarks about Palladin's management team, specifically Palladin's CEO Ward, verbally and in writing, and instructed employees not to communicate or comply with critical directives from Palladin's CEO Ward, in breach of their fiduciary duties.  Ward and Ward's estate are the sole beneficial owners of Palladin, having reinvested greater than $63 million into Palladin over its 10+ year history of full-time operations.

335.   While employed by Palladin, Millman, Prescott and Nguyen coordinated efforts to exfiltrate trade secret and confidential information from Palladin's electronic storage systems, without permission and without legitimate cause, in breach of their fiduciary duties.

336.   While employed by Palladin, Millman, Prescott and Nguyen encouraged Palladin employees to leave the company and seek other employment or become employed by companies that compete with Palladin, including Whole Group and Kelley Austin/Perficient, in breach of their fiduciary duties.

337.   While employed by Palladin, Millman took active measures to undermine Palladin's relationship with WideOrbit in favor of establishing a relationship that depends solely on him, in breach of his fiduciary duties.

338.   By way of examples of self-serving behavior, WideOrbit terminated its relationship with Palladin after Millman resigned and joined Perficient, and the WideOrbit agreement with Palladin, executed by Prescott and managed as the "sole gateway" by Millman, was never entered into Palladin's document handling system.

339.   On information and belief, Millman's activities were known by both Prescott and Nguyen, and all three expected to benefit from harming Palladin's business interests.

340.   Millman was acting on his own behalf and for the benefit of Prescott and Nguyen in his self-serving undertakings.  Millman did nothing to increase revenues at Palladin over an extended period time while he plotted his move to a competitor, and by doing so, he devalued Palladin's equity and enterprise value while at the same time creating an off ramp for Palladin's business to follow him to Kelley Austin/Perficient.

341.   Millman, Prescott and Nguyen's employment at the aforementioned entities immediately after their departure from Palladin was made possible due to

their collective neglect of their duties and responsibilities at Palladin, in favor of self-serving employment with competing entities.

342.   Nguyen's deletion of files on his company computer was an attempt to conceal his breaches and acts undertaken on behalf of individuals and entities other than Palladin, in breach of his fiduciary duties, and spoliating key evidence.

343.   As a direct and proximate result of Millman, Prescott and Nguyen's breaches of their fiduciary duties, Palladin has suffered damages.

344.   Palladin is entitled to an award for all damages caused by Millman, Prescott and Nguyen's breaches of their fiduciary duties and duties of loyalty, the exact amount of which will be demonstrated and proved at the time of trial.

345.   Millman, Prescott and Nguyen's conduct exhibit willful misconduct, malice, fraud, wantonness, oppression or the entire want of care that would raise the presumption of conscious indifference to consequences, such that Palladin is entitled to punitive damages in an amount to be determined at trial.

346.   Millman, Prescott and Nguyen have acted in bad faith, have been stubbornly litigious, and have caused Palladin unnecessary trouble and expense. Palladin is therefore entitled to an award for its attorneys' fees and costs of litigation pursuant to O.C.G.A § 13-6-11.

## COUNT IV
## ACTION FOR UNFAITHFUL AGENT
### (against Millman, Prescott and Nguyen)

347.   Plaintiff repeats and re-alleges the allegations of paragraphs 1 through 262 above as if fully set forth herein.

348.   As agents of Palladin, Millman, Prescott and Nguyen owed a fiduciary duty of good faith pursuant to O.C.G.A § 10-6-31.

349.   At a minimum, Millman, Prescott and Nguyen forfeited their right to all compensation from the point at which they began to act in a manner contrary to their fiduciary duties to Palladin.

350.   As a direct and proximate result of Millman, Prescott and Nguyen's actions as unfaithful agents of Palladin, Palladin is entitled to an amount to be determined at trial for all compensation which was paid to Millman, Prescott and Nguyen during the time they were disloyal agents to Palladin, and any additional consequential  damages from Millman, Prescott and Nguyen's failure to fulfill their duties to Palladin.

## COUNT V
## UNJUST ENRICHMENT
### (against Millman)

351.   Plaintiff repeats and re-alleges the allegations of paragraphs 1 through 262 above as if fully set forth herein.

352. As a result of Millman's self-dealing and document misappropriation with respect to the WideOrbit relationship, Millman is in possession of funds and/or property that rightfully belongs to Palladin, in violation of his employment agreement and its post-termination covenants not to misappropriate trade secret information.

353. Palladin made significant investments in the property misappropriated by Millman in terms of Palladin resources that were directed by Millman, with Prescott's approval, to create valuable assets that were specific to WideOrbit. The WideOrbit relationship and pipeline was central to Palladin's growth plans in 2026, championed, valued and entered into Palladin's CRM at Prescott's direction, and to Millman's specific knowledge.

354. Millman has benefitted from taking Palladin resources and assets that were specific to the WideOrbit relationship, and from creating the impression at WideOrbit that he is the only one capable of satisfying their needs. Millman is now in possession of documents, resources, assets and trade secrets that are valuable for establishing a relationship with WideOrbit at his new place of employment, and additionally, those documents will be valuable in making future relationships with entities like WideOrbit.

355. The continued retention of these assets by Millman would result in Millman being unjustly enriched to the detriment of Palladin.

356. Palladin is entitled to an award of damages for the amount by which Millman has been unjustly enriched, to be determined at trial.

## COUNT VI
## USURPATION OF CORPORATE OPPORTUNITIES
### (against Millman, Nguyen and Prescott)

357. Plaintiff repeats and re-alleges the allegations of paragraphs 1 through 262 above as if fully set forth herein.

358. Millman, Nguyen and Prescott were employed in a fiduciary capacity by Palladin, and, as such, owed Palladin the utmost duties of loyalty, good faith, and fair dealing.

359. During Millman, Nguyen and Prescott's employment at Palladin, there existed certain opportunities falling within the scope and ability of Palladin's business, as to which Palladin had both an interest and expectancy growing out of its prior efforts, client relationships, and goodwill.

360. Millman Nguyen and Prescott, acting individually and/or for the benefit of Whole Group, Salesforce and/or Kelley Austin/Perficient, usurped and/or attempted to usurp Palladin's corporate opportunities for the purpose and with the effect of injuring Palladin to their own advantage and otherwise engaged in conduct violative of Millman, Nguyen and Prescott's fiduciary duties to Palladin.

361. The actions of Millman and Prescott as alleged herein entitled Palladin to recover all compensatory and punitive damages flowing therefrom, as well as all appropriate equitable relief, including injunctive relief and disgorgement of all monies paid to them by Palladin following breach of their duties, profits, and/or revenue.

## COUNT VII
## VIOLATION OF GEORGIA COMPUTER SYSTEMS PROTECTION ACT
### (against Millman, Prescott, and Nguyen)

362. Plaintiff repeats and re-alleges the allegations of paragraphs 1 through 262 above as if fully set forth herein.

363. Palladin's computers and computer systems constitute a "computer" as that term is defined by O.C.G.A § 16-9-92.

364. Millman, Prescott and Nguyen used Palladin's computer and computer networks "without authority" as that phrase is defined by O.C.G.A. § 16-9-92.

365. Millman, Prescott and Nguyen acted on behalf of, and for the benefit of, themselves and/or Kelley Austin/Perficient, Salesforce, and/or Whole Group by engaging in the computer misconduct described herein.

366. Millman, Prescott and Nguyen used Palladin's computers and computer networks with knowledge that such use was without authority, and with the intention of taking or appropriating Palladin's property by taking thousands of

103

files and retaining them and the information contained therein for use at their new places of employment in violation of O.C.G.A. § 16-9-93(a).

367.   Nguyen used Palladin's computers and computer networks with knowledge that such use was without authority, and with the intention of deleting or in any way removing, either temporarily or permanently, any computer program or data from a computer or computer network of Palladin's in violation of O.C.G.A. § 16-9-93(b)(1).

368.   Millman, Prescott and Nguyen exceeded their authorized access to Palladin's protected computers by accessing and transferring information from Palladin's protected computers and systems and deleting evidence of their transmission of that information for the improper purpose of usurping Palladin's business opportunities for the benefit of themselves and their future employers.

369.   Millman, Prescott and Nguyen purposefully and without authorization exfiltrated information from Palladin's computers and systems and transmitted the information to a location outside of Palladin's network.

370.   Palladin has been injured by reason of Millman, Prescott and Nguyen's violations of O.C.G.A. § 16-9-93 and is entitled to an award of compensatory damages against Millman, Prescott and Nguyen and the costs of this suit, in an amount to be determined at trial.

371. Palladin is entitled to all of the remedies and relief set forth in the Georgia Computer Systems Protection Act, O.C.G.A § 16-9-90 *et seq*., including, without limitation, damages, which include, but are not limited to, compensatory damages for lost profits and victim expenditure, injunctive relief, disgorgement of revenue and/or profits and other equitable relief and attorneys' fees in an amount to be determined at trial.

### COUNT VIII
### VIOLATION OF COMPUTER FRAUD AND ABUSE ACT
### (18 U.S.C. § 1030 et seq.)
### (against Millman, Prescott and Nguyen)

372. Plaintiff repeats and re-alleges the allegations of paragraphs 1 through 262 above as if fully set forth herein.

373. Palladin's computers are computers used in and affecting interstate commerce and communication and are therefore "protected computers" under 18 U.S.C. § 1030(e)(2).

374. In violation of the Computer Fraud and Abuse Act ("CFAA"), including at least 18 U.S.C. §§ 1030(a)(2)(c) and (a)(4), Millman, Prescott and Nguyen knowingly and with intent to defraud, exceeded their authorized access to Palladin's protected computers by accessing and transferring information from Palladin's protected computers and systems and deleting evidence of their transmission of that information for the improper purpose of usurping Palladin's

105

business opportunities for the benefit of themselves and/or their future employers, Whole Group, Salesforce and Kelley Austin/Perficient.

375. Millman, Prescott and Nguyen knowingly and with intent to defraud, accessed protected Palladin computers and systems within this judicial district without authorization, and/or exceeded authorized access, and by means of such conduct further the intended fraud and obtained a thing of value.

376. Millman, Prescott and Nguyen purposefully and without authorization exfiltrated information from Palladin's computers and systems and transmitted the information to a location outside Palladin's network.

377. By intentionally accessing Palladin's protected computers without authorization and exceeding the scope of authorized access to violate, Millman, Prescott and Nguyen violated the Computer Fraud and Abuse Act.

378. As a direct and proximate cause of Millman, Prescott and Nguyen's unlawful conduct, Palladin has incurred costs and suffered damages in an amount to be proven at trial.

379. Millman, Prescott and Nguyen's conduct caused Palladin loss and damage to its computer systems within the meaning of 18 U.S.C. §§ 1030(e)(8) and (11). As a direct and proximate cause of Millman, Prescott and Nguyen's unlawful conduct, Palladin has suffered and will continue to suffer financial losses and irreparable harm. The losses and harm to Palladin are ongoing and cannot be

remedied by damages alone, and exceed the $5,000 threshold in one year standard as set forth in the CFAA.

## COUNT IX
## GEORGIA TRADE SECRETS ACT (O.C.G.A. § 10-1-760 *et seq.*)
### (against all Defendants)

380.    Plaintiff repeats and re-alleges the allegations of paragraphs 1 through 262 above as if fully set forth herein.

381.    The Georgia Trade Secrets Act of 1990, O.C.G.A. § 10-1-760, *et seq.* ("GTSA"), prohibits any person from misappropriating trade secrets by improper means, e.g., theft, bribery, breach of contract or other duty, including inducement of such breach.

382.    The "actual or threatened misappropriation [of a trade secret] may be enjoined." O.C.G.A. § 10-1-762.  Millman, Nguyen and Prescott have actually misappropriated Palladin's confidential and trade secret documents.  Additionally, Millman has threatened to misappropriate confidential and trade secret information by denying that Palladin owns trade secrets and by falsely claiming his ownership to WideOrbit connector documents.  In addition to or in lieu of injunctive relief, a person is entitled to recover damages for trade secret misappropriation.  O.C.G.A. § 10-1-763.

383.    By virtue of their employment with, and performance of responsibilities for, Palladin, Millman, Prescott and Nguyen were given access to,

improperly took and now possess trade secrets belonging to Palladin which, on information and belief, they are using in the course of their employment at Kelley Austin/Perficient, Salesforce, and Whole Group, respectively.

384.   Defendants' retention and actual and/or threatened or prospective use and disclosure of Palladin's trade secrets constitute misappropriation of Palladin's trade secrets in violation of the Georgia Trade Secrets Act.

385.   As a result of the Defendants' wrongdoing, Palladin has suffered monetary damages and has suffered substantial and irreparable injury and is threatened with further substantial and irreparable injury due to the loss and use by Defendants of their trade secrets, for which there is no adequate remedy at law to compensate.

386.   By reason of the foregoing, Palladin requires injunctive relief.  Unless injunctive relief is granted, Palladin will be irreparably harmed in a manner not fully compensable by money damages.  In addition, Palladin has been damaged in an amount to be determined at trial.

387.   Defendants' misappropriation of Palladin's trade secrets is willful, wanton, reckless and malicious, entitling Palladin to an award of exemplary damages in an amount authorized by O.C.G.A § 10-1-763(b).

388.   Pursuant to O.C.G.A. § 10-1-764, Palladin is entitled to an award of its attorneys' fees and costs incurred in this action because Defendants have

willfully and maliciously misappropriated the trade secrets of Palladin, knowing them to be trade secrets.

## COUNT X
## CIVIL CONSPIRACY
### (against Millman, Prescott and Nguyen)

389. Plaintiff repeats and re-alleges the allegations set forth above as if fully set forth herein.

390. As described herein, Millman, Prescott and Nguyen have engaged in tortious conduct and have committed acts constituting violations of Palladin's statutory, common law, and contractual rights.

391. In so doing, Millman, Prescott and Nguyen have acted pursuant to and in accordance with a common plan or design for the purpose and with the effect of injuring Palladin to their own advantage. As such, Millman, Prescott and Nguyen have conspired to accomplish unlawful ends and/or to accomplish lawful ends by unlawful means.

392. Each Defendant (Millman, Prescott and Nguyen) either participated in the design, formation, and implementation of the conspiracy or joined the conspiracy with knowledge of its existence and purpose and committed acts in furtherance. As such, liability for the tortious conduct and contractual, statutory, and common law violations committed by one or some Defendants is imputed to all Defendants.

393.   Palladin has suffered damage and loss by reason of Defendants' acts in furtherance of the above-described conspiracy in an amount to be determined at trial.

394.   Defendants have acted maliciously and with intent to harm Palladin, or with conscious indifference to the consequences of their actions, thereby entitling Palladin to an award of punitive damages.

## COUNT XI
## UNFAIR COMPETITION UNDER THE LANHAM ACT
### (against all defendants)

395.   Plaintiff repeats and re-alleges the allegations of paragraphs 1 through 262 above as if fully set forth herein.

396.   Palladin created a wide variety of marketing and promotional materials and methods of doing business to attract and service customers.  Palladin paid for the development of software tools to use in conjunction with providing its services, including one specific for WideOrbit connector product which, on information and belief, Millman and Prescott misappropriated with the help of Nguyen to use with and for the benefit of themselves and their new employers, including Perficient.  Nguyen massively downloaded confidential documents which among other things will provide a seamless transition of Palladin customers and employees to the defendants for their benefit and to the detriment of Palladin.

110

397.   While employed by Palladin, Prescott and Millman misrepresented to Palladin customers Palladin's and their own capabilities in order to attract those customers to their new employers and to prevent the Movate acquisition from going forward.  Circumvention of the Movate acquisition and hiring Palladin's top management personnel without regard to their fiduciary and contractual obligations has allowed Perficient to unfairly compete with Palladin.  On information and belief, Millman and Perficient are now soliciting Palladin customers willfully, with full knowledge, or willful blindness, of Millman's covenants and duties to Palladin.

398.   Millman, Prescott, Nguyen and Perficient, on information and belief, are now using Palladin's confidential information to compete unfairly, by among other things, violating covenants and duties to Palladin and using to their advantage confidential information taken from Palladin.

399.   Palladin has been damaged by the defendants' conduct in an amount to be determined at trial.

## COUNT XII
## TORTIOUS INTERFERENCE WITH CONTRACTUAL
## AND BUSINESS RELATIONS
### (against Millman, Prescott and Perficient)

400.   Plaintiff repeats and re-alleges the allegations of paragraphs 1 through 262 above as if fully set forth herein.

111

401.   On information and belief, Millman and Prescott promoted themselves at the expense of Palladin while employed by Palladin in a manner that caused Palladin's existing clients and partners to leave Palladin after Millman and Prescott resigned.

402.   Prior to departing, Millman and Prescott misappropriated confidential and trade secret documents to assist them when soliciting Palladin's customers and employees after Millman and Prescott resigned.  Misappropriated confidential information included customer files with details of each customer relationship, including pricing for consulting services, all to divert existing customers and prospective customers to Perficient.

403.   Through means and methods described herein, Millman and Prescott have caused third parties to enter into business relationships with them rather than Palladin.

404.   Such improper and wrongful conduct was performed without Palladin's approval or any other legal privilege.

405.   Millman and Prescott acted purposefully and with malice with the intent of injuring Palladin by diverting sales revenue away from Palladin and injuring Palladin's goodwill and standing in the business community to Millman, Prescott's and Perficient's benefit.

112

406.    Millman and Prescott's tortious interference proximately caused and continues to proximately cause damage to Palladin through the loss of business revenue and goodwill.

407.    Additionally, Perficient improperly interfered with Palladin's contractual relationship with Millman, Prescott and Nguyen, in particular the confidentiality obligations contained in each such Confidentiality Agreement, by improperly and wrongly encouraging and causing Millman, Prescott and Nguyen to disclose Palladin's confidential information in breach of their contractual obligations.

408.    Such improper and wrongful conduct was performed without Palladin's approval or any other legal privilege.

409.    Millman, Prescott and Perficient acted purposefully and with malice with the intent to injure Palladin by inducing each other to breach contractual obligations to assist in diverting sales revenue away from Palladin and injuring Palladin's goodwill and standing in the business community to their benefit.

410.    The defendants' conduct proximately caused and continues to proximately cause damage to Palladin through, among other ways, the misuse of its confidential information, causing loss of business revenue and goodwill.

113

## COUNT XIII
## PUNITIVE DAMAGES
### (against Millman, Prescott, Nguyen, and Perficient)

411.   Palladin repeats and re-alleges the allegations set forth above as if fully set forth herein.

412.   Due to Millman, Prescott, Nguyen, and Perficient's willful and malicious misappropriation of trade secrets, Palladin is entitled to an award of punitive damages pursuant to O.C.G.A. § 10-1-763.

413.   Millman, Prescott, Nguyen, and Perficient's actions constitute willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care that would raise the presumption of conscious indifference to the consequences of their actions. Furthermore, upon information and belief, Millman, Prescott, Nguyen, and Perficient acted with the specific intent to cause harm to Palladin. Accordingly, Palladin is entitled to an award of punitive damages pursuant to O.C.G.A. § 51-12-5.1 in an amount to be determined at trial.

WHEREFORE, Palladin prays that this Honorable Court do the following:

(a) Enter an injunction against all Defendants, jointly and severally, ordering them to immediately return all of Palladin's confidential, proprietary, and/or trade secret information in their possession;

(b) Enter an injunction prohibiting Defendants from soliciting or attempting to solicit Palladin clients, or prospects;

114

(c) Enter an injunction prohibiting Defendants from recruiting or attempting to recruit Palladin employees;

(d) Enter an injunction prohibiting Defendants from disparaging Palladin or any of its employees or officers;

(e) Enter a permanent injunction against Defendants, jointly and severally , enjoining them from any further use of Palladin's confidential proprietary, and/or trade secret information for any purpose, and enjoining them from soliciting or attempting to solicit clients or prospects or recruiting or attempting to recruit Palladin employees for the twenty-four month term specified in Defendants' employment agreement (Prescott and Nguyen; 12 months for Millman), as well as enjoining them from disparaging Palladin and its employees and officers;

(f) Order Defendants to disgorge the unlawful revenues, commissions, and/or profits by defendants for monies received from Palladin and from all business done with Palladin clients or prospects at or on behalf of Whole Group and/or Kelley Austin/Perficient;

(g) Award Palladin actual damages against Defendants, jointly and severally, in an amount to be proven at trial for all ascertainable and

115

calculable damages, losses, and/or loss of revenues and opportunities occasioned by Defendants' conduct and breaches;

(h) Award Palladin compensatory damages for the actional claims herein;

(i) Award Palladin statutory damages against Defendants, jointly and severally, for violation of the statutes that form the basis of the specified statutory claims herein;

(j) Award Palladin punitive damages for the applicable claims herein;

(k) Award Palladin its reasonable attorneys' fees and expenses of litigation incurred in pursuing this Complaint;

(l) Award pre-judgment and post-judgment interest as allowed by law; and

(m)  For such other and further relief as the Court deems just, proper, and equitable under the circumstances.

## DEMAND FOR JURY TRIAL

Palladin hereby demands a jury trial.

Respectfully submitted, this 7th day of May, 2026.

THRIFT MCLEMORE

*/s/ Ryan McLemore*
Ryan McLemore
Ga. Bar. No. 496929

1000 Parkwood Cir, SE, St. 950
Atlanta, GA  30339
(678)882-0830
rmclemore@thriftlegal.com

**PENNINGTON OLIAK PLLC**
Beth A. Oliak (*pro hac* motion to be filed)
Edward A. Pennington (*pro hac* motion to be filed)
1055 Thomas Jefferson Street, NW, Ste. L35
Washington, DC 20007
(202) 897-2725
(202) 838-8245 (fax)
oliakb@pennoliak.com
epennington@pennoliak.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1(D), the undersigned counsel for Palladin certifies that the foregoing document has been prepared in Times New Roman, 14 point type, which is one of the font and point selections approved by the Court in Local Rule 5.1(B).

                                        */s/ Ryan McLemore*
                                        Ryan McLemore
                                        Ga. Bar No. 496929

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| PALLADIN TECHNOLOGIES, LLC and PALLADIN CONSULTING, LLC, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. _____ |
| JONATHON MILLMAN, TUAN NGUYEN, RYAN PRESCOTT, and PERFICIENT, INC., | ) ) ) ) | |
| Defendants. | ) ) | |

**VERIFICATION**

Personally appeared before me, an officer duly authorized to administer oaths, Brandon Ward, who, being duly sworn, deposes and states under oath that: he is the Chief Executive Officer of Plaintiff Palladin Technologies, LLC, which is the managing member of Plaintiff Palladin Consulting, LLC; he is authorized to make this verification on behalf of both Plaintiffs; and the facts contained in the foregoing Verified Complaint for Injunctive Relief and Damages are true and correct.

This information may not be based solely on the knowledge of the executing party and may include information obtained by and through employees, agents, and/or representatives of Palladin Technologies, LLC and Palladin Consulting, LLC.  The word usage and sentence structure may be that of the attorney assisting in the preparation of this

pleading and does not necessarily purport to be the precise language of the

executing party.

Palladin Technologies, LLC
By: CEO
    Brandon Ward

Sworn to and subscribed before me
This 2 day of May, 2026.

Notary Public
My Commission Expires: 01/10/2028

JOSEPH DANIEL VOGEL
DEKALB County
Notary Public
Expires 01-10-2028
STATE OF GEORGIA

- 2 -